718 F.2d 515
 4 Employee Benefits Ca 2369
 Thomas BIRMINGHAM and Anthony J. Morano, Plaintiffs-Appellees,
v.
SOGEN-SWISS INTERNATIONAL CORPORATION RETIREMENT PLAN,
George J. Helwig, Hans P. Offenborn, Gerd Schaeffer, United
States Trust Company of New York and SoGen-Swiss
International Corporation, Defendants,
SoGen-Swiss International Corporation Retirement Plan,
George J. Helwig, Hans P. Offenborn, Gerd
Schaeffer, and SoGen-Swiss International
Corporation, Defendants-Appellants.
 No. 1074, Docket 82-7934.
 United States Court of Appeals,
Second Circuit.
 Argued March 25, 1983.
Decided Sept. 14, 1983.
 
 Matthew Gluck, New York City (Fried, Frank, Harris, Shriver & Jacobson, William F. McGuinness, New York City, of counsel), for defendants-appellants.
 Gilbert Siegel, New York City (Garrell, Siegel & Katz, New York City, of counsel), for plaintiffs-appellees.
 Before OAKES, CARDAMONE and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Defendants SoGen-Swiss International Corporation Retirement Plan ("the Plan"), George J. Helwig, Hans P. Offenborn, Gerd Schaeffer, and SoGen-Swiss International Corporation (collectively "SoGen"), appeal from Judge Carter's grant of summary judgment in favor of the plaintiffs Thomas Birmingham and Anthony Morano. 529 F.Supp. 86. He held that the plaintiffs were entitled to certain lump sum pension benefit payments.
 
 
 2
 We affirm.
 
 FACTS
 
 3
 Birmingham and Morano were participants in the Plan on April 11, 1979, when SoGen-Swiss International Corporation was dissolved and the Plan was terminated. At that time Birmingham was fifty-three years old and Morano was thirty-seven. According to Article 10 of the Plan, it was to be administered by a committee (the "Retirement Committee") appointed by SoGen's Board of Directors. The Retirement Committee was to
 
 
 4
 consist of not less than 3 Employees who shall, subject to the Board of Directors, have control of the detailed operation and administration of the Plan, with all powers necessary to enable such Committee properly to carry out its duties in that respect, subject at all times to the limitations and conditions provided for in the Plan.
 
 
 5
 Section 10.1 of the Plan designated the Retirement Committee the "named fiduciary" pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1102(a) (1976), and delegated to it, among others, the following specific powers and duties:
 
 Section 10.2(b)
 
 6
 To interpret the Plan and to decide any and all matters arising hereunder, including the right to remedy possible ambiguities, inconsistencies or omissions; provided, however, that all such interpretations and decisions shall be applied in a uniform manner to all Employees similarly situated; [and];
 
 Section 10.2(c)
 
 7
 To compute the amount of any benefit which shall be payable to any Member, Contingent Annuitant, or Spouse in accordance with the provisions of the Plan.
 
 
 8
 At the time of termination, the Retirement Committee consisted of four employees of SoGen, including plaintiff Birmingham.
 
 
 9
 The present dispute involves the rights of Birmingham and Morano to accrued benefits upon termination of the Plan. Article Twelve[1] of the Plan provides that in the event of termination "all benefits accrued to the Discontinuance Date to the extent then funded are non-forfeitable for Members." In addition to certain specifically prioritized benefits, Plan participants are to receive "all other vested benefits as determined under Article Seven." Article Seven in turn provides that a participant's vested benefit "shall be a percentage [as shown in the vesting schedule] of the Accrued Pension credited to him in accordance with Sections 4.1 or 4.3 to the date of his termination of Service." A member's "Accrued Pension," is defined in section 1.1 as his or her "Accrued Normal Retirement Pension or Accrued Minimum Pension determined in accordance with the Plan's benefit formulas described in Sections 4.1 and 4.3."
 
 
 10
 Article Four, "Amount of Pension,"[2] establishes two retirement options for employees: (i) Section 4.1, the "Normal" retirement pension which could be received beginning at age sixty-five, and (ii) Section 4.2, an optional "Early Retirement" pension, commencing at age fifty-five, if the employee has completed five years of service and would have completed fifteen years of service by the normal retirement date. Section 4.3 introduces time of service and amount of salary as elements in the formulae and establishes two categories of Accrued Minimum Pension, one for "Normal Retirement" and one for "Early Retirement." The Accrued Minimum Normal Retirement Pension is for the retiring employee who has reached age sixty-five and completed fifteen years of service. The Accrued Minimum Early Retirement Pension is for the retiring employee who has reached age fifty-five, has completed five years of service, and would have completed fifteen years of service at age sixty-five had he continued in employment. As stated, the formulae appear to assume that accrued benefits will be determined only upon an employee's reaching the relevant retirement age.
 
 
 11
 In anticipation of the Plan's termination upon SoGen's dissolution, a member of the Retirement Committee and the attorney for the successor corporation met with the Plan's actuaries. Two interpretations of the Plan with regard to the age from which actuarial reduction to lump sum payments would occur were discussed. Under the first, ("Interpretation One"), all employees would be required to take an amount equivalent to the normal retirement pension actuarily reduced from age sixty-five. Under the second, ("Interpretation Two"), employees under fifty-five who had completed five years of service would have the option of receiving the early retirement pension actuarily reduced from age fifty-five.
 
 
 12
 Interpretation Two favored most employees under the age of fifty-five, who would receive substantially larger benefits, while Interpretation One favored the successor corporation, which would receive the Plan's unexpended funds. Under Interpretation One, for example, Birmingham would receive roughly $28,000. Under Interpretation Two, he would receive $94,979. On April 9, 1979, the Retirement Committee voted unanimously, with one abstention, to accept Interpretation Two. Two of the three committee members voting were under the age of fifty-five. The successor corporation's attorney objected to the Retirement Committee's choice as incorrect as a matter of law.
 
 
 13
 On April 11, SoGen's Board of Directors met for the last time to disband the corporation and terminate the Plan. At the meeting, the Retirement Committee's resolution was discussed, and questions as to its legality were aired. No conclusion was reached, other than that "outstanding legal and other actions" would be determined by a reconstituted committee ("New Committee") established to wind up the affairs of the Plan. After the recommendations of the Retirement Committee were recorded in the minutes, the Board adopted a formal resolution terminating the Plan and appointing the individual defendants, who are employees of the successor corporation, as the New Committee. The resolution specified that the New Committee was to take such action as was necessary to ensure approval by the Pension Benefit Guaranty Corporation and the Internal Revenue Service, satisfy the Plan's liability to participants and "take such further action as may be necessary or desirable to implement the intent of the above Resolution." On May 8, 1979, the New Committee purported to revoke the April 9 resolution of the Retirement Committee and to adopt Interpretation One. Payments to participants in the Plan were made on the basis of that decision.
 
 
 14
 Birmingham and Morano instituted an action pursuant to Section 502 of ERISA, 29 U.S.C. Sec. 1132 (1976), seeking the balance of the final lump sum pension benefit payments under Interpretation Two. After discovery, all parties moved for summary judgment.
 
 
 15
 In granting summary judgment in favor of the plaintiffs, Judge Carter found that Interpretation Two was a permissible, but not mandatory, reading of the Plan. Nevertheless, he believed that SoGen's Board of Directors had the power under section 12.3 of the Plan to override the Retirement Committee's resolution. See note 1, supra. He held, however, that the Board's actions on April 11 neither revoked the decision of the Retirement Committee nor authorized the New Committee to do so. Therefore, he held that the selection of Interpretation Two was valid.
 
 
 16
 Judge Carter also rejected the defendants' claim that the Retirement Committee's resolution was invalid because two of the four committee members were under fifty-five and stood to benefit from the interpretation they chose. Instead, he held that the committee members benefited only incidentally as members of a larger class of employees under age fifty-five and that the Plan's conflict of interest rule prohibited committee members from voting only when specific claims of their own were involved.
 
 
 17
 Judge Carter thus held that Birmingham and Morano were entitled to the difference between the payments based on Interpretation One each had received and the amount payable under Interpretation Two. In addition, the defendants were ordered to pay the plaintiffs' attorneys' fees as provided in section 502(g) of ERISA, 29 U.S.C. Sec. 1132(g).
 
 
 18
 The above issues are the subject of the instant appeal. We affirm.DISCUSSION
 
 
 19
 SoGen argues that Judge Carter's conclusion that the Board neither revoked the Retirement Committee's resolution nor empowered the New Committee to do so rests on a factual finding regarding the Board's intent as to which the evidence is ambiguous. It thus claims that a dispute as to a material fact exists and that summary judgment may not be granted. While we agree that summary judgment may not be granted on those grounds, we affirm because we conclude that, regardless of its intent, the Board lacked the power to overrule the Retirement Committee's interpretation of the Plan.
 
 
 20
 The district court relied upon Section 12.3, see note 1, supra, in concluding that the Board had the power to determine the allocation of benefits upon the Plan's termination. However, Section 12.3 merely directs the Board to make appropriate actuarial calculations according to allocative priorities enumerated in detail and to determine the form in which beneficiaries may withdraw the amounts due them. Nothing in Section 12.3 authorizes the Board to choose between conflicting interpretations of other articles of the Plan. To the contrary, that power is lodged in the Retirement Committee under Section 10.2(b) which empowers it "[t]o interpret the Plan and to decide any and all matters arising hereunder, including the right to remedy possible ambiguities, inconsistencies or omissions." The Retirement Committee was clearly acting under that grant of authority when it adopted Interpretation Two.
 
 
 21
 The only limitation on the Retirement Committee's seemingly exclusive power to interpret the Plan, other than judicial review, is contained in Section 10.1 which says the "Committee ... shall, subject to the Board of Directors, have control of the detailed operation and administration of the Plan, with all powers necessary" (emphasis added). Appellants argue that the "subject to" language empowers the Board to review, modify or overrule virtually every act of the Retirement Committee, including the rendering of interpretations under Section 10.2(b). Were the Plan's language the only guide to our decision, we would be inclined to read it as a reservation by the Board of the right to alter the powers or composition of the Retirement Committee or to designate another person or group to be the "named Fiduciary" under ERISA. A residual power may also exist to overrule acts of the Retirement Committee which plainly violate the Plan, breach the Retirement Committee's fiduciary duty or violate ERISA.
 
 
 22
 Nevertheless, we would not be inclined to view this language as reserving the right to review and alter every exercise of power by the Retirement Committee since such a reserved power would be an anomaly in the Plan as structured. There is no established procedure for appeal of actions of the Retirement Committee to the Board, and many of the Retirement Committee's powers, such as computing individual benefits, Section 10.2(a), authorizing disbursements, Section 10.2(d), and initiating claims on behalf of a deceased employee, Section 10.3, are necessarily exercised between Board meetings and not reviewable before becoming effective. Moreover, if the language "subject to the Board of Directors" modifies all powers of the Retirement Committee and no appeal procedure is set out, the most rational import of the language would seem to be a requirement that the Retirement Committee seek the Board's permission for each exercise of power. There is absolutely nothing to indicate that such an unusual requirement was intended. At best, therefore, we would conclude that the Board's power to overrule actions of the Retirement Committee (in contrast to a reserved power to designate a new "named fiduciary," etc.) is limited to cases where the Retirement Committee has plainly exceeded its authority or violated the terms of either the Plan or ERISA.
 
 
 23
 However, we need not define the precise relationship between the Board and the Retirement Committee under the terms of the Plan since the Retirement Committee's authority is derived from ERISA as well as from the Plan. Under ERISA, a "named fiduciary" has the "authority to control and manage the operation and administration of the plan." 29 U.S.C. Sec. 1102(a)(1). We have no difficulty in concluding that these powers, even apart from Section 10.2(b) of the Plan, include the rendering of interpretations as to the meaning of the provisions of the Plan. We also have no difficulty in holding that the "subject to" language does not by itself alter the statutory grant of authority embodied in Section 1102(a)(1). A valid plan under ERISA must designate "a named fiduciary" so that responsibility for managing and operating the Plan--and liability for mismanagement--are focused with a degree of certainty. See H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5075-78, 5081[3]. This is in the interest of the beneficiaries, but it is also in the interest of a sponsoring corporation such as SoGen. Were the argument accepted that its Board had the authority to review and alter every action of the Retirement Committee, the corporation might well be exposed to liability and its assets put in peril for all of the Retirement Committee's actions. 29 U.S.C. Secs. 1102(21)(A), Sec. 1105. The very purpose of requiring the designation of a "named fiduciary" would thus be undermined by SoGen's interpretation. It would diffuse responsibility where Congress intended to focus it and would set a precedent which plan sponsors such as SoGen would soon come to rue. In so holding, we do not decide the extent to which a sponsor may reserve powers to itself. We hold only that such a reservation in derogation of a statutory grant of power must be done explicitly and with precision and that the "subject to" language fails to accomplish that end.
 
 
 24
 ERISA itself thus calls upon us to read the "subject to" language as no more than a reservation of the right to alter the powers or composition of the Retirement Committee, to designate a new "named fiduciary," and, perhaps, to overrule actions of the Retirement Committee which violate the Plan, ERISA or the Retirement Committee's fiduciary duty. It does not include the power to overrule a specific and valid exercise of the Retirement Committee's authority under the Plan and ERISA.
 
 
 25
 We must now determine whether the Retirement Committee's adoption of Interpretation Two was valid. SoGen argues that Interpretation Two is clearly contrary to the plain wording of the Plan and, therefore, a nullity. SoGen's contention is that Interpretation Two is invalid because a retiree must be fifty-five years old in order to be eligible for early retirement under the Plan. Therefore, it argues, the early retirement provisions do not apply to those employees who were not yet fifty-five as of the termination date and only the normal retirement benefits, actuarily reduced, apply. As Judge Carter pointed out, however, "it could just as well be argued that only employees having reached the age of 65 would be eligible for normal retirement benefits," thereby making the normal benefits provision inapplicable to all employees under sixty-five at the date of termination.
 
 
 26
 SoGen's arguments apply with equal force to Interpretation One because the Plan's formulae, as drafted, assume the employees in question have actually reached a retirement age, even though participants are clearly entitled to accrued benefits upon termination of the Plan, whatever their age. SoGen's contention thus underlines the fact that the Plan gives no clear answer to the problem of calculating benefits upon termination, an "omission" which the Retirement Committee had full authority to "remedy" under Section 10.2(b) of the Plan. Since Interpretation Two is not contrary to any other provision of the Plan and its adoption was within the authority of the Retirement Committee, the Board lacked the power to overrule the Retirement Committee's action, and, a fortiori, to authorize the New Committee to do so. Since the New Committee was in no sense a successor to the Retirement Committee, the Plan having been terminated and its members not being employees of SoGen, it had no independent power of its own to overrule the Retirement Committee.
 
 
 27
 SoGen also argues that the Retirement Committee's choice of Interpretation Two is invalid because of the conflict of interest of the voting members under age fifty-five. Section 10.7 of the Plan provides: "No member of the Committee may act, vote or otherwise influence a decision of the Committee specifically relating to his own participation under this Plan." While the existence of a conflict is undeniable, we agree with Judge Carter's analysis that the Retirement Committee's adoption of Interpretation Two did not apply only to specific members, but affected them as members of the larger class of all employees under fifty-five. The broader reading of the conflict of interest provision urged by SoGen would prohibit the Retirement Committee members, who must be employees of SoGen and participants in the Plan, from voting on virtually any matter affecting the level of benefits to participants, leaving the "named fiduciary" under ERISA hamstrung. We also note that the principal purpose of such a conflict of interest provision is to prevent a committee member from profiting at the expense of other beneficiaries of the Plan. Here the asserted conflict is that the beneficiaries may profit at the expense of the successor corporation. Sponsors of such plans have ample means of protecting themselves in drafting pension plans against the kind of eventualities which have arisen in this case. Moreover, the alternative, the New Committee, also has a conflict of interest since the successor corporation, which employs its members, has a strong financial interest in the adoption of Interpretation One.
 
 
 28
 SoGen also raises several objections to the award of counsel fees. As the district court noted, attorney's fees may be awarded to the prevailing party under ERISA in the absence of some particular justification for not doing so. Central States Southeast v. Hitchings Trucking, Inc., 492 F.Supp. 906 (E.D.Mich.1980); cf. Fase v. Seafarers Welfare and Pension Plan, 589 F.2d 112 (2d Cir.1978). Judge Carter further found:
 
 
 29
 Plaintiff's attorney's labors in prosecuting this action have been substantial. Defendants can probably afford the expenses involved, [citation omitted] and in general there appears no reason why fees should not be awarded.
 
 
 30
 The plaintiffs' attorney submitted an affidavit of services performed by him and several other lawyers for 314 hours expended at $150 per hour, but limited his application to the agreed upon contingency fee of $29,000. After eliminating fifty-one hours of other attorneys' time as irrelevant, the court determined that plaintiffs' attorney was entitled to $39,450 but awarded the $29,000 sought, 61.5% of his actual time according to the reconstructed time charges accepted by Judge Carter.
 
 
 31
 SoGen claims that the district court awarded attorneys' fees at the "uniform premium rate of $150 per hour." This assertion is not true, since the award gave plaintiffs' attorney $29,000 for 263 hours. Moreover, contrary to SoGen's assertions, Judge Carter did consider the complexity of the issues involved and the "substantial effort" of the plaintiffs' attorney in opposing defendants' "high level counsel who fought the case bitterly to the very end and even now continue their recalcitrant posture."
 
 
 32
 We also find no merit in SoGen's challenge to the validity of the time records submitted to the court. Contemporaneous time records are now required in this Circuit for work performed after June 25, 1983, New York State Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136 at 1147-48 (2d Cir.1983), but reconstructed records for work done before that date are acceptable, although the absence of contemporaneous records is to be considered in determining the actual time spent in the rendition of services. City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir.1974); In re Borgenicht, 470 F.2d 283 (2d Cir.1972); Blank v. Talley Industries, Inc., 390 F.Supp. 1 (S.D.N.Y.1975). The district court was well within its discretion in the award of counsel fees.
 
 
 33
 The judgment is affirmed.
 
 
 
 [1]
 The relevant provisions of Article Twelve are as follows:
 
 
 [12]
 1 Effect of Termination--The Plan is purely voluntary on the part of the Company and the Company reserves the right to terminate the Plan and/or the trust and to discontinue contributions at any time (hereinafter referred to as the Discontinuance Date). Upon termination of the Plan or permanent discontinuance of contributions hereunder, all benefits accrued to the Discontinuance Date to the extent then funded, are non-forfeitable for Members, retired Members and their beneficiaries
 
 
 [12]
 2 Allocation of Trust Fund--If the trust is in existence at the time of the termination of the Plan, the Equitable Policies shall be delivered to the applicable Swiss American Plan Members. The Company, after reserving an amount sufficient to pay all expenses and charges and subject to any necessary approval of the Pension Benefit Guaranty Corporation, shall direct the Trustee, through the Board of Directors, to allocate the assets in the Fund or their proceeds in the following order of precedence:
 (a) There shall first be set aside from the Member's Accumulated Contributions, if any, the amount necessary to provide Pension benefits generated from his Accumulated Contributions.
 (b) There shall next be set aside an amount which, in addition to the amount determined in (a) above, will provide Pension benefits for Members, Spouses, Contingent Annuitants or beneficiaries who were receiving benefits or who were eligible to receive benefits at least three (3) years prior to the Discontinuance Date based on Plan provisions in effect 5 years prior to the Discontinuance Date.
 (c) There shall next be set aside an amount which, in addition to the amounts in (a) and (b) above, will provide all other insured benefits, as provided for under Title IV, Section 4044 of ERISA.
 (d) There shall next be set aside an amount which, in addition to the amounts in (a), (b) and (c) above, will provide all other vested benefits, as determined under Article Seven, under the provisions of the Plan on its Discontinuance Date, but which are not insured under ERISA.
 (e) Finally, there shall be set aside an amount which in addition to the amount in (a) above, will provide the Accrued Pension for members who were not vested in accordance with Article Seven as of the Discontinuance Date.
 If the assets of the Trust Fund are not sufficient to provide in whole the amounts required within the classes above, such assets will be allocated pro rata within the class in which the amounts first cannot be provided in full.
 Allocation in any of the above listed categories is adjusted for any allocation already made to the same person under a prior category. Allocation of assets may be modified by the Internal Revenue Service to meet non-discrimination requirements. After all liabilities have been satisfied with respect to Members, the Company shall be entitled to any balances of the Fund which shall remain.
 
 
 [12]
 3 Basis for Allocation--The foregoing allocation shall be made as determined by the Board of Directors on the basis of actuarial valuations. The Board of Directors may require Members, retired Members and beneficiaries entitled thereto to withdraw amounts allocated to them in cash or in the form of immediate or deferred annuities or otherwise as the Board of Directors may determine
 
 
 [2]
 Article Four provides in pertinent part:
 
 
 [4]
 1 Normal Retirement Pension--A Member retired in accordance with Section 3.1 shall be entitled to receive an annual Accrued Normal Retirement Pension, commencing on his Normal Retirement Date, equal to the sum of (a) and (b) as follows:
 (a) Benefit for Credited Service After the Effective Date: 1% of FAE up to the CCB and 1 1/2% of FAE in excess of CCB, multiplied by Credited Service after the Effective Date.
 (b) Benefit for Credited Service Before the Effective Date:
 (i) SoGen International Plan Members:
 The greater of:
 1% of FAE up to the CCB and 1 1/2% of FAE in excess of the CCB, multiplied by Credited Service before the Effective Date; or
 1% of a Member's 1969-1973 average annual earnings up to $7,800 and 1 1/2% of a Member's 1969-1973 average annual earnings in excess of $7,800, multiplied by Credited Service before the Effective Date.
 (ii) Swiss American Plan Members:
 the Equitable Policies' cash value (without further Company contributions after November 30, 1973) payable from age 65 for those Employees who surrendered their Equitable Policies, the greater of:
 1% of FAE up to the CCB and 1 1/2% of FAE in excess of the CCB multiplied by Credited Service before December 1, 1973;
 or
 the annuity value, beginning at Normal Retirement Date, of the cash values of the policies surrendered, according to actuarial assumptions established by the Committee.
 (iii) Other Swiss American Employees:
 1% of FAE up to the CCB and 1 1/2% of FAE in excess of the CCB multiplied by Credited Service before the Effective Date.
 
 
 [4]
 2 Early Retirement Pension--A Member retired in accordance with Section 3.2 will be entitled to receive an annual Accrued Normal Retirement Pension, commencing on his Early Retirement Date, determined in accordance with the formulas set forth in Section 4.1 above, reduced in accordance with tables of actuarial equivalency if the Employee elects commencement of benefits prior to age 65. Any benefits payable from the Equitable Policies shall be paid in accordance with the terms of such Equitable Policies
 
 
 [4]
 3 Accrued Minimum Pension--A Member who as of his Normal Retirement Date on or after July 1, 1976 has completed 15 or more years of Service shall be entitled to receive an annual Pension, commencing on his Normal Retirement Date, equal to the greater of (a) or (b) where:
 (a) is his Accrued Normal Retirement Pension computed in accordance with the provisions of Section 4.1; and
 (b) is an Accrued Minimum Pension equal to 40% of his Final Average Earnings less 50% of his annual "Primary Insurance Amount" as defined in the Federal Social Security Act in effect at his Retirement Date.
 In the event a Member retires as of an Early Retirement Date on or after July 1, 1976 and provided that he would otherwise have had 15 years of Service at his Normal Retirement Date had he continued in employment, his annual Pension, commencing on his Early Retirement Date, shall equal the greater of (c) or (d) where:
 (c) is the Early Retirement Pension computed in accordance with provisions of Section 4.2; and
 (d) is the Accrued Minimum Pension computed in accordance with Section 4.3(b) above except that:
 (i) Earnings paid to him in the last complete calendar year of employment shall be deemed to have continued unchanged to his Normal Retirement Date;
 (ii) The 50% "Primary Insurance Amount" shall be reduced by 1/15 for each of the first 5 years that commencement of pension precedes age 65 and 1/30 for each year thereafter. The "Primary Insurance Amount" shall be computed as if the earnings paid to the employee in the last complete calendar year of his employment had continued unchanged to his Normal Retirement Date; and shall be the Primary Insurance Amount determined under the law then in effect on his Early Retirement Date.
 (iii) The minimum early retirement benefit shall be reduced by multiplying it by the ratio of his Credited Service to his Early Retirement Date over the number of years of Credited Service the Member would have had at his Normal Retirement Date.
 The Accrued Minimum Pension shall be applicable only to a Member who has completed, or would have completed 15 or more years of Service or his Normal Retirement Date.
 
 
 [3]
 A pertinent excerpt from the House Report reads:
 the plan document is to provide for the "named fiduciaries" who have authority to control and manage the plan operations and administration. A named fiduciary may be a person whose name actually appears in the document, or may be a person who holds an office specified in the document, such as the company president. A named fiduciary also may be a person who is identified by the employer or union, under a procedure set out in the document. For example, the plan may provide that the employer's board of directors is to choose the person who manages or controls the plan. In addition, a named fiduciary may be a person identified by the employers and union acting jointly. For example, the members of a joint board of trustees of a Taft-Hartley plan would usually be named fiduciaries.
 H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. 297, reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5078.