Joseph **SCALAMANDRE, Individually and as Executor Under the Last Will and Testament of the late Carolee Scalamandre, Plaintiff,**

v.

**OXFORD HEALTH PLANS (N.Y.), INC., Oxford Health Insurance, Inc. and Oxford Health Plans, Inc., Defendants.**

No. 91–CV–3895 (TCP).

United States District Court,
E.D. New York.

June 15, 1993.

Louis J. Castellano, Jr., Garden City, NY, for plaintiff.

James Thomas Murphy, Floral Park, NY, for defendants.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

Joseph Scalamandre has brought this lawsuit, as Executor under the Last Will and Testament of the late Carolee Scalamandre, alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Specifically, Mr. Scalamandre challenges, under 29

U.S.C. § 1132, the denial of health benefits by defendants Oxford Health Plans (N.Y.), Inc., Oxford Health Insurance, Inc., and Oxford Health Plans, Inc. (hereinafter referred to collectively as "Oxford") for expenses incurred in connection with a procedure known as High Dose Chemotherapy with Autologous Bone Marrow Transplant ("HDC/ABMT") performed on Mrs. Scalamandre by physicians at Montefiore Medical Center.

After a five-day trial, during which the Court heard the testimony of the principal actors at Oxford, among others, and having evaluated the witnesses' credibility, the exhibits received in evidence, including the operative documents evidencing Mrs. Scalamandre's medical benefits contract, and the parties' proposed findings of fact and legal contentions, the Court finds that plaintiff is entitled to judgment in his favor.

## I. FINDINGS OF FACT

### A. THE MEDICAL BENEFITS CONTRACT

In 1991, plaintiff Joseph Scalamandre and the late Carolee Scalamandre were husband and wife living together in Freeport, New York. Joseph Scalamandre was and still is vice president of Peter Scalamandre & Sons, Inc., a corporation incorporated and existing under the laws of the State of New York.

In October of 1989, Oxford issued a medical benefits contract to Peter Scalamandre & Sons, Inc., that covered Carolee Scalamandre. Called the "Freedom Plan," this medical benefits contract emphasizes the fact that it offers broad health care coverage while allowing its members to receive health care from the doctor, hospital, or health care provider of their choice. *The Oxford Freedom Plan Member Handbook* at 3.

The operative documents constituting the medical benefits contract are Plaintiff's Exhibit 4 in Evidence, *The Oxford Freedom Plan Member Handbook* (hereinafter *The Handbook*) and Plaintiff's Exhibit 5 in Evidence, the Oxford Group Enrollment Agreement—New York (hereinafter the "Group Enrollment Agreement").

The Group Enrollment Agreement is the contract, effective January 1, 1990, between Oxford Health Plans (NY), Inc. and plaintiff's corporation and employer, Peter Scalamandre & Sons, Inc. It specifies that Oxford Health Plans (NY), Inc. "shall provide and/or arrange for medical and hospital services" in accordance with the terms and provisions of the Group Enrollment Agreement and the other contracts issued in conjunction therewith to members enrolled thereunder. The Group Enrollment Agreement, in essence, delineates the legal duties and responsibilities of Oxford Health Plans (NY), Inc. and Peter Scalamandre & Sons, Inc., including *inter alia*, the costs of coverage. It is undisputed that both Mr. and Mrs. Scalamandre were members enrolled under the Group Enrollment Agreement through Peter Scalamandre & Sons, Inc.

*The Handbook*, which is not merged into the Group Enrollment Agreement but is incorporated therein, details the legal obligations between Oxford and plaintiff. It consists of fifty-eight consecutively numbered, printed pages in a bound booklet, divided into four parts: (1) a Plan Summary, (pp. 5–11), including instructions on how to use the Freedom Plan, (p. 4); (2) an HMO Group Certificate, (pp. 12–29); (3) a Supplemental Freedom Plan Certificate, (pp. 31–56); and (4) instructions on how to file an Oxford claim form, (p. 57). It is the terms of the Supplemental Freedom Plan Certificate and certain provisions in the Plan Summary which plaintiff claims Oxford breached.

In the first part of the instructions section, *The Handbook* summarizes "How to Use the Freedom Plan" by stating:

You also may seek medical care outside of the Oxford HMO. This allows you to visit any physician, specialist, hospital or health care provider for medical attention. Coverage will be provided by an Oxford subsidiary company, Oxford Health Insurance, Inc. Non–HMO coverage will be similar to conventional insurance—all charges are subject to fee schedule limitations, and benefits will be paid after the applicable

deductible and coinsurance requirements are met.

*The Handbook* at 4.

On the third page of the Plan Summary and instructions, all insureds are specifically advised that:

Even if you choose to seek medical care from non-Oxford providers, you must still comply with Oxford's Medical Review Guidelines. If you are advised by your physician to undergo elective surgery or be admitted to the hospital, you must first contact Oxford for pre-authorization. We recommend at least 14 days advance notice. Certain procedures require a second opinion. An Oxford Health Services Coordinator will notify you at the time you call for pre-authorization if a second opinion is required. The second opinion will be rendered by a board certified specialist designated by Oxford. This specialist has met all of Oxford's credentialling requirements and has no financial stake in Oxford or the recommended procedure ... Failure to obtain authorization in advance or failure to comply with Oxford's medical review guidelines will result in reduced or denied benefits.

*Id.* at 6.

Part 4 of the Supplemental Freedom Plan Certificate provides with respect to "Pre–Determination of Medical Treatment":

For the maximum benefits that are described in DETERMINATION OF BENEFITS (and that are later referred to as 'Medical Director–Certified Benefits' or simply, 'Certified Benefits') to be payable, charges for certain Non–HMO Expenses must be submitted to and certified by the Medical Director, in the following manner.

1. With respect to any Hospital confinement, Certified Benefits will be payable for all Covered Expenses incurred during the period of confinement that occurs under any of the following circumstances:

a) for any non-emergency Hospital confinement, if, at least 14 days in advance of any such confinement, a statement of the reason for and the anticipat-

ed period of Hospital confinement is submitted to and certified by the Medical Director;

\*　\*　\*　\*　\*　\*

*Id.* at 46. The Supplemental Freedom Plan Certificate also specifically provides under "Supplemental Medical Expense Benefits: Covered Expenses":

\*　\*　\*　\*　\*　\*

Covered Expenses are the following charges, and benefits payable for such charges are subject to all the terms of this Certificate.

\*　\*　\*　\*　\*　\*

6. Charges for the following medical services and supplies:

\*　\*　\*　\*　\*　\*

b) chemotherapy;

*Id.* at 49. It further lists 44 specific non-covered expenses, none of which is applicable here. *Id.* at 50–52. Moreover, the Supplemental Freedom Plan Certificate lists 28 separate surgical procedures when a second opinion is "necessary," none of which is applicable here. *Id.* at 37–38. Finally, it states that a "Non-certified Occurrence" is:

Each instance in which the Medical Director was not contacted but should have been contacted in accordance with the terms of PRE–DETERMINATION OF MEDICAL TREATMENT.

*Id.*

## B. MRS. SCALAMANDRE'S ILLNESS

In 1988, Carolee Scalamandre contracted metastatic breast cancer, which gradually spread to her lymph nodes, lungs and liver. Her treating physician, Ronald Bash, M.D., treated Mrs. Scalamandre by administering rapid sequencing of chemotherapy every three weeks. By July of 1991, her estimated life expectancy was only eight weeks. In an effort to extend this period, Dr. Bash recommended that Mrs. Scalamandre see Peter H. Wiernik, M.D., the chairman of the Department of Medical Oncology at the Albert Einstein College of Medicine,[1] to explore the

---

1. Montefiore Medical Center is one of the teaching hospitals affiliated with the Albert Einstein College of Medicine. (Tr. 412).

possibility of undergoing HDC/ABMT. Upon this recommendation, Mrs. Scalamandre was examined by Dr. Wiernik, who confirmed that HDC/ABMT might indeed be the best treatment for Mrs. Scalamandre.

HDC/ABMT is often an effective method of treating metastatic breast cancer. The response of cancer cells to chemotherapy is proportional to the dose applied, so in order to achieve favorable results in the treatment of breast cancer it is often necessary to employ high dose chemotherapy. Beyond certain doses, however, chemotherapy can destroy the patient's bone marrow and in turn impair the immune system and make the patient vulnerable to the most minute infections. Therefore, in order to be able to employ high dose chemotherapy without endangering the patient, an Autologous Bone Marrow Transplant is performed, where the surgeon surgically extracts about one liter of bone marrow from the patient's lower back, preserves the bone marrow, administers the high dose chemotherapy, and then intravenously introduces the preserved bone marrow back into the patient. Ideally, within a few weeks the bone marrow regenerates while the cancer has been eradicated due to the high dose chemotherapy.

As a prerequisite to HDC/ABMT, it is ordinarily necessary for the patient to have a bone marrow biopsy in order to determine whether or not the bone marrow is healthy and free of cancer. If the biopsy reveals that the bone marrow is healthy and free of cancer, the patient may proceed with the HDC/ABMT.

In the case at bar, Mrs. Scalamandre entered Montefiore Medical Center on July 8, 1991 on an out-patient basis to have the bone marrow biopsy performed. The biopsy showed that the cancer had not spread to Mrs. Scalamandre's bone marrow, so that it was possible to proceed with the HDC/ABMT. Mrs. Scalamandre was scheduled to enter Montefiore Medical Center sometime around July 25, 1991 to begin the procedure.

Before receiving the bone marrow biopsy, the Comptroller of Peter Scalamandre & Sons, Inc., Martin McCarthy, attempted to ensure that the expenses would be covered under the Freedom Plan. As noted above, HDC/ABMT is not specifically excluded as a "non-covered expense" under the Freedom Plan. *The Handbook* at 50–52. Moreover, the treatment is a high dose form of chemotherapy, and chemotherapy is listed as a covered expense under the Freedom Plan without qualification as to the dose level. *Id.* at 49.

Under the Freedom Plan, to receive full benefits for any elective surgery or hospitalization, an Oxford member must request approval through the Oxford Medical Review Program by submitting to the Medical Director "a statement of the reason for and the anticipated period of Hospital confinement." *Id.* at 46. At least 14 days advance notice is required. *Id.* When the member calls for pre-certification, an Oxford Health Services Coordinator will tell the member whether a second opinion will be necessary. *Id.* at 6. If so, the second opinion will be performed by "a board certified specialist designated by Oxford" and with "no financial stake in Oxford or the recommended procedure." *Id.*

In accordance with the above-mentioned provisions, Mr. McCarthy telephoned Oxford on behalf of Mrs. Scalamandre on July 3, 1991 to request pre-certification for both the bone marrow biopsy and the HDC/ABMT. (Tr. 601, 667). McCarthy spoke with a Health Services Coordinator at Oxford, Suzanne Adams, R.N., who pre-certified the bone marrow biopsy that was to be performed at Montefiore Medical Center on July 8, 1991. (Tr. 667–68). As to the pre-certification of the HDC/ABMT, Suzanne Adams told McCarthy on July 3, 1991 that she could not give McCarthy a pre-certification number at that time because she needed more information about dates and names of physicians. (Tr. 659–60). Adams also suggested to McCarthy that Mrs. Scalamandre explore the bone marrow transplant programs at Duke University Medical Center and/or Hahnemann Medical Center. While it is unclear from the testimony whether Adams' suggestion about Duke and/or Hahnemann occurred

on July 3 or at a later time,[2] it is evident that neither Adams nor anyone else at Oxford told McCarthy or anyone else that it was necessary for Mrs. Scalamandre to obtain a second opinion. Moreover, no one gave McCarthy the specific name of a "board certified specialist."[3]

Some time after Mrs. Scalamandre's bone marrow biopsy on July 8, her doctors at Montefiore scheduled her HDC/ABMT to begin on July 25. McCarthy telephoned Suzanne Adams on or about July 24 to inform her that Mrs. Scalamandre was entering Montefiore for the HDC/ABMT. It was at this point, on July 25, that Adams orally informed McCarthy that certification for Mrs. Scalamandre's HDC/ABMT at Montefiore had been denied. Adams suggested (either for the first time or for the second time) that Mrs. Scalamandre investigate similar programs at Duke and/or Hahnemann, but again, did not offer names of physicians at either hospital or provide any written authorization to make an appointment for a second opinion.

Notwithstanding the representation by Suzanne Adams that Oxford would not certify Mrs. Scalamandre at Montefiore, Mrs. Scalamandre entered Montefiore on July 25, 1991. Her stay was for about six weeks, during which time her bone marrow was extracted and she underwent high dose chemotherapy. Her treating physician during this stay was Niculae Ciobanu, M.D.

During this time, Oxford sent a letter to Mr. Scalamandre dated August 19, 1991 and signed by Alan E. Sokolow, M.D. Plaintiff's Exhibit 2 in Evidence. This letter, sent after Mrs. Scalamandre had already been hospitalized for twenty-four days and commenced HDC/ABMT treatment, stated that:

> This is to confirm Oxford Health Plans' decision, already conveyed by phone to your business associate, Mr. McCarthy on August 15, 1991, and to Montefiore Medical Center on August 14, 1991. Oxford Health Plans has denied coverage for your wife Carolee's 7/26/91 admission to Montefiore Medical Center.

The letter went on to explain that had Mrs. Scalamandre undergone the same treatment at Duke or Hahnemann, Oxford would have paid for said treatment. The letter then stated, however, that "[g]iven transplant protocol, Mrs. Scalamandre was deemed *an ineligible candidate for both programs*, and therefore, would not be eligible for benefits with Oxford Health Plans." (emphasis added).[4] In essence, this letter notified Mr. Scalamandre that there was no hospital at which Oxford would reimburse for Mrs. Scalamandre's HDC/ABMT. Furthermore, this was the first time that anyone at Oxford notified Mr. Scalamandre or his agents in writing of the denial of coverage for Mrs. Scalamandre at Montefiore.

Mrs. Scalamandre was discharged from Montefiore on September 9, 1991 for one week. She reentered Montefiore on September 16, when her treating physicians continued the HDC/ABMT procedure by providing Mrs. Scalamandre with high dose chemotherapy and then restoring her preserved bone marrow. (Tr. 137). Initially, on September

---

**2.** Adams testified at trial that during the initial conversation on July 3, 1991 she told McCarthy to explore Duke and/or Hahnemann. (Tr. 601, 660). McCarthy, on the other hand, testified that Adams did not recommend Duke and/or Hahnemann until several weeks later, presumably July 24, when she also notified McCarthy that Mrs. Scalamandre was being denied pre-certification at Montefiore. (Tr. 31, 43, 44).

**3.** While Dr. Sokolow, Oxford's Medical Director, testified that Oxford offered Mrs. Scalamandre a choice of two physicians to render a second opinion—a Dr. Peters at Duke and a Dr. Stadtmeier in Pennsylvania—it is unclear when this choice was offered to Mrs. Scalamandre, if ever. (Tr. 218). Dr. Sokolow admitted that neither he nor, to the best of his knowledge, anyone else at Oxford ever communicated with either of these doctors to request that they render a second opinion in connection with Mrs. Scalamandre. (Tr. 218–19). Dr. Sokolow admitted that pursuant to Oxford's obligations under the Freedom Plan, Oxford is required to set up the mechanics for obtaining a second opinion, but that they did not do so in this case. (Tr. 219).

**4.** It appears that Mrs. Scalamandre would have been ineligible at Duke and Hahnemann because she had previously received a drug called Adriamycin, and under the protocols at Duke and Hahnemann, HDC/ABMT may not be performed on a patient who has received Adriamycin. The amount of Adriamycin she received, however, was within the limits of the protocol at Montefiore. (Tr. 365).

12, 1991 Suzanne Adams at Oxford pre-certified this second admission. Eventually, however, Oxford withdrew this pre-certification because it felt that Messrs. Scalamandre and McCarthy misled Oxford as to the reason for this second admission.

Mrs. Scalamandre was discharged for the final time from Montefiore on October 31, 1991. According to the testimony of Dr. Ciobanu, her doctor at Montefiore, the treatment successfully extended her life expectancy. (Tr. 380). Subsequently, Michael Carroll, an employee of Peter Scalamandre & Sons, Inc., submitted all bills and proofs of claim for the HDC/ABMT to Oxford by certified mail, return receipt requested, on February 10 and February 18, 1992. The alleged total for claims unpaid is $165,041.02.[5]

On October 9, 1991, Mr. and Mrs. Scalamandre filed this lawsuit, seeking to recoup from Oxford claims submitted and unpaid in the sum of $165,041.02 plus interest, costs, disbursements and reasonable legal fees.

On January 10, 1992, Mrs. Scalamandre died at South Nassau Community Hospital in Oceanside, New York. Mr. Scalamandre was appointed Executor under her will pursuant to the decree of the Nassau County Surrogate Court.

## II. CONCLUSIONS OF LAW/LIABILITY

### A. JURISDICTION

Jurisdiction of this Court is grounded in 28 U.S.C. § 1331, as the case presents a federal question under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. The parties agree that the health insurance policy at issue is an ERISA plan, and thus, the statutory and case law governing that Act is to be applied.

### B. STANDARD OF REVIEW

It is undisputed that Mrs. Scalamandre was a covered party within the policy of health insurance issued by defendants. Thus, she was and her estate is entitled to payment for medical treatment she received, subject to the policy terms. Oxford raises several grounds on which it based its denial of benefits. Before reaching the merits of these grounds, however, the Court must determine as a threshold matter the standard of review.

■ The United States Supreme Court has held that in a claim brought pursuant to 29 U.S.C. § 1132(a)(1)(B) challenging the denial of benefits based on the interpretation of an ERISA-regulated plan, the denial "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co., et al. v. Bruch, et al.*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). When a trustee exercises discretionary powers, an abuse of discretion or arbitrary and capricious standard of review is appropriate. *Id.* at 111, 109 S.Ct. at 954.

■ In the case at bar, Oxford argues that its determination that plaintiff is not entitled to health benefits in connection with Mrs. Scalamandre's HDC/ABMT must be reviewed under an arbitrary and capricious standard. In support of its argument, Oxford refers to provisions in *The Handbook* that Oxford claims give its Medical Director discretion relating to the payment of benefits under the Plan. Specifically, Oxford refers to Part 4, Section 1 which reads:

> With respect to any Hospital Confinement, Certified Benefits will be payable for all Covered Expenses incurred during the period of confinement that occurs under any of the following circumstances:
>
> a. for any non-emergency Hospital Confinement, if, at least fourteen (14) days in advance of any such confinement, a statement of the reason for and the anticipated period of Hospital Confine-

---

5. The Claims Supervisor for Oxford has acknowledged that Oxford has received timely filed proofs of claim for Mrs. Scalamandre's two hospitalizations and treatment in connection with the HDC/ABMT in an amount totalling $161,-352.92, which remain unpaid. Plaintiff's Exhibit 27 in Evidence; (Tr. 782). Mr. Scalamandre claims that his company submitted an additional claim for a bill in the amount of $3,688.10, which Oxford claims it never received. Thus, Mr. Scalamandre claims that the total unpaid bill remains $165,041.02. (Tr. 887).

ment is submitted to and certified by the Medical Director.

*The Handbook* at 46. Further, Oxford refers to a provision in *The Handbook* entitled "Supplemental Medical Expenses Benefits: Covered Expenses," which reads:

A Covered Expense is the lesser of the Usual Charge or the Reasonable Charge for any of the services and supplies listed below. Such services and supplies must be recommended or approved by a Doctor as medically necessary and incurred while insurance or an Extension of Benefits is in force. They must also be medically necessary, in our judgment, for the treatment of a Covered Person's Injury or Sickness for which insurance is provided under the policy.

*Id.* at 48. Oxford then quotes from the "Definition" section in *The Handbook* where "medically necessary services and/or supplies" are defined as:

the use of services or supplies as provided by a Hospital, Skilled Nursing Facility, Physician or other provider required to identify or treat a Member's illness or injury and which, as determined by the Medical Director, are:

1. Consistent with the symptoms or diagnosis and treatment of the Covered Person's condition, disease, ailment or injury;

2. Appropriate with regard to standards of good medical practice;

3. Not solely for the convenience of the Covered Person, his or her Physician, Hospital, or other health care provider; and

4. The most appropriate supply or level of service which can be safely provided to the Covered Person. When specifically applied to an inpatient, it further means that the Covered Person's medical symptoms or condition requires that the diagnosis or treatment cannot be safely provided to the Covered Person as an outpatient.

*Id.* at 37. Finally, Oxford quotes from the definition of "Necessary Second Opinion Procedure," which reads:

Any procedure that:

1. Can be scheduled at the convenience of the Covered Person and the Covered Person's Surgeon;

2. Is not a Medical Emergency;

3. Requires a Second Opinion, as determined by the Medical Director. The Medical Director must be notified at least 14 days in advance of any [sic] being scheduled which is not a Medical Emergency.

*Id.*

Oxford argues that these provisions demonstrate "that the Medical Director, as Plan Administrator, has discretionary authority to determine when and if individual members are entitled to coverage of their hospitalizations, out-patient procedures and other benefits and circumstances covered by the Plan," and that "[p]lan language clearly relies upon the judgment of the Medical Director in a host of areas, from in-patient hospitalizations to basic determinations regarding the medical necessity of a proposed treatment." Post–Trial Memorandum at 4. Thus, argues Oxford, because its Medical Director was bestowed with discretionary authority under the Freedom Plan, this Court must review Oxford's denial of benefits by determining whether Oxford acted in an arbitrary and capricious manner.

The Freedom Plan, however, provides in its "Definitions" that its only "Non-certified Occurrence" is:

Each instance in which the Medical Director was not contacted but should have been contacted in accordance with the terms of PRE–DETERMINATION OF MEDICAL TREATMENT.

*The Handbook* at 38. Thus, there is evidence that *The Handbook* did not bestow upon the Medical Director broad discretionary authority, as Oxford suggests.

Moreover, the provisions in *The Handbook* relied on by Oxford are very similar to the insurance contract provisions relied on by the insurer in *Masella v. Blue Cross & Blue Shield of Conn.,* 936 F.2d 98 (2d Cir.1991), where the Second Circuit held that the plan provisions did not establish that the insurer was granted discretionary authority to con-

strue the terms of the plan.[6] The Court found that the "plan provisions relied on by [defendant] bear little resemblance to the typical plan provisions cited in recent post-*Firestone* appellate decisions as the basis for a more deferential review." *Id.* at 103. Central to the Second Circuit's decision in *Masella* was its finding that the insurer had the ability to protect itself by including a provision in the contract giving it discretionary authority to interpret the terms of the plan, yet chose not to do so. *Id.*

Indeed, in the vast majority of decisions since *Firestone* that have held that a deferential standard of review applies there were explicit provisions in the respective plans giving the trustee or plan administrator discretion to interpret the plan. For instance, in *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556 (11th Cir.1990), which Oxford cites in its Post–Trial Memorandum, there was an explicit provision granting discretion to the insurer which was quite different from the provisions cited by Oxford in the case at bar. The provision provided:

> As a condition precedent to coverage, it is agreed that whenever [Blue Cross] *makes reasonable determinations which are not arbitrary and capricious* in the administration of the [plan] (including, without limitation, determinations whether services, care, treatment or supplies are Medically Necessary ...), *such determinations shall be final and conclusive.*

*Brown* at 1559 (emphasis added). It was solely this provision which led the Eleventh Circuit to conclude that the insurer was entitled to "the benefit of the bargain it made in the insurance contract" and that the arbitrary and capricious standard applied. *Id.* at 1563.

Similarly, in *Bucci v. Blue Cross–Blue Shield of Connecticut, Inc.*, 764 F.Supp. 728 (D.Conn.1991) (emphasis added), also cited by Oxford, the Court held that defendant's denial must be reviewed under the arbitrary and capricious standard because the plan gave "defendant the '*discretionary authority*

to determine eligibility for benefits.'" *See also Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir.1990) (plan gave trustees the power "to construe the provisions of ... the Plan" and provided that any construction adopted by the trustees in good faith would be binding); *Batchelor v. International Brotherhood of Electrical Workers Local 861 Pension & Retirement fund*, 877 F.2d 441, 443 (5th Cir.1989) (plan gave trustees, "full power to construe the provisions of this Agreement" as well as the authority to "interpret the Plan"); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir.1989) (plan conferred upon the trustees "full power to construe the provisions of [the] Trust").

█ In contrast, in the case at bar Oxford has proffered no provision in *The Handbook* or anywhere else that gives Oxford explicit discretion to construe the insurance contract. As the Supreme Court emphasized in *Firestone:*

> ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 [103 S.Ct. 2890, 2896, 77 L.Ed.2d 490] (1983) and 'to protect contractually defined benefits.' *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 [105 S.Ct. 3085, 3093, 87 L.Ed.2d 96] (1985).

489 U.S. at 113, 109 S.Ct. at 956. In this vein, the burden is on the plan administrator to establish that it has discretionary authority in awarding benefits under a plan. *Arthurs v. Metropolitan Life Ins. Co.*, 760 F.Supp. 1095, 1098 (S.D.N.Y.1991); *See also Moon v. American Home Assurance Co.*, 888 F.2d 86, 88–89 (11th Cir.1989); *Baxter v. Lynn*, 886 F.2d 182, 187 (8th Cir.1989); *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir.1989). "In making this determination, any ambiguities must be construed against the administrator and in favor of the party seeking judicial review." *Arthurs*, 760 F.Supp. at 1098.

---

6. One of the provisions relied on by the insurer in *Masella* provided:

 The provisions of this Major Medical Expense Plan are subject to the terms and conditions of a basic medical/surgical program *which is acceptable to the Corporation, in its sole discretion.*

 936 F.2d at 100 n. 1 (emphasis added).

■ Because Oxford has not proffered an explicit provision granting it discretionary authority to interpret the terms of its health insurance plan, it has not met its burden of demonstrating that it was bestowed with such authority, and therefore, *Firestone* requires that this Court apply a *de novo* review of the plan interpretation that led to the denial of the Scalamandres' claims, without deference to Oxford's determination.[7]

## C. APPROPRIATENESS OF OXFORD'S DENIAL

Upon hearing and reviewing the testimony of the various witnesses at trial and evaluating the exhibits received into evidence as well as the parties' legal arguments, this Court finds that for the following reasons Oxford improperly denied coverage to Mrs. Scalamandre.

■ As an initial matter, it must be stated that the Scalamandres properly followed the instructions of the Freedom Plan as set forth on pages 6 and 46 of *The Handbook.* Martin McCarthy communicated with Suzanne Adams at Oxford to obtain pre-authorization on July 3, 1991, which was more than 14 days in advance of Mrs. Scalamandre's admission for HDC/ABMT on July 25, 1991. HDC/ABMT is not listed as an expense not covered under the Freedom Plan; it is not a "Non-certified Occurrence";[8] and it is not specifically listed as a procedure requiring a second opinion. Therefore, unless Oxford had notified Mr. McCarthy that a second opinion would be necessary, McCarthy and the Scalamandres would, based on the Freedom Plan, expect to receive pre-certification for the HDC/ABMT. While it is true that Suzanne Adams notified Mr. McCarthy on July 25 that Oxford would not cover the HDC/ABMT, and while in hindsight it might not have been wise for Mr. Scalamandre to admit his wife to Montefiore without first obtaining authorization from the insurer, unfortunately, Mr. Scalamandre did not have the benefit of hindsight. Mr. Scalamandre testified at trial that the doctors at Montefiore notified him at the last minute that Mrs. Scalamandre was to be admitted on July 25. At that time he was concerned with one thing—saving his wife's life—and as far as he knew, the only place where this could be done immediately was at Montefiore Medical Center. (Tr. 154, 158, 159, 161).

Moreover, Oxford's response to McCarthy's request for pre-certification breached the terms of the Freedom Plan in several ways. First, if when Suzanne Adams told McCarthy that they should look into Duke or Hahnemann this meant that Mrs. Scalamandre must obtain a second opinion, this was done in violation of the instructions in *The Handbook* which require Oxford to notify the patient that a second opinion is required "*at the time [the patient] call[s] for pre-authorization.*" *The Handbook* at 6. Oxford did not do this but suggested that Scalamandre *investigate* the programs at Duke and/or Hahnemann. McCarthy testified that Suzanne Adams did not even do this during the initial request for pre-certification on July 3, but told him about Duke and/or Hahnemann three weeks after he had requested pre-certification and the day before Mrs. Scalamandre was scheduled for admission to Montefiore. Clearly, this would have been a

---

7. It should be noted that even if the Court were to apply an arbitrary and capricious standard Oxford still would not be entitled to the broad discretion to which it claims it is entitled. In *Firestone,* the Supreme Court noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " 489 U.S. at 115, 109 S.Ct. at 957, quoting Restatement (Second) of Trusts § 187, Comment d (1959). Such a conflict of interest is present in the case at bar where Oxford serves as the decisionmaker for benefits that are paid out of its own assets. Several courts since *Firestone* have held that when a conflict of interest exists on the part of the fiduciary responsible for bene-

fits determination, the fiduciary has the burden to prove that its interpretation of the plan provisions was not tainted by self-interest. *See Brown v. Blue Cross & Blue Shield of Alabama,* 898 F.2d at 1566; *Arthurs,* 760 F.Supp. at 1098. Thus, even under an arbitrary and capricious standard, Oxford would have the burden of showing that its denial of benefits to Mrs. Scalamandre was not tainted by self-interest.

8. As stated above, a "Non-certified Occurrence" is an "instance in which the Medical Director was not contacted but should have been contacted ..." *The Handbook* at 38. Here, the Medical Director was contacted on July 3, 1991.

breach of the instructions in the Freedom Plan. Even if the Court were to accept the testimony of Suzanne Adams that she told McCarthy on July 3 to look into Duke and/or Hahnemann, this also was a breach of the contract in that there is no provision in the Freedom Plan that states that Oxford may summarily determine at which hospital a surgical procedure is to be performed. The Freedom Plan merely states that a second opinion may be required.[9]

Second, if a second opinion was necessary, the Freedom Plan requires that Oxford designate a board certified specialist to provide it. Oxford never designated a certified specialist. Duke and Hahnemann are institutions, not "board certified specialists." Although Dr. Sokolow testified that Oxford offered the Scalamandres a choice of two physicians—Dr. Peters at Duke or Dr. Stadtmeier in Pennsylvania—Suzanne Adams was the person with whom McCarthy communicated on behalf of the Scalamandres, and she testified that she never offered the names of any physicians. (Tr. 624).[10]

Finally, under the instructions to the Freedom Plan, the board certified specialist appointed to render a second opinion must have "no financial stake in Oxford or the recommended procedure." *The Handbook* at 6. Even if one could view the recommendation of programs at Duke and Hahnemann as equivalent to the designation of a board certified specialist (which, as discussed above, it obviously is not), both hospitals would have had a financial stake in the procedure and thus could not have satisfied the contract requirements. (Tr. 880).

In sum, after the Scalamandres followed the proper procedures for obtaining pre-certification for the HDC/ABMT, Oxford responded in a way that breached several provisions of the Freedom Plan. Oxford may not now claim that the Scalamandres failed to obtain pre-certification when the procedure Oxford followed in denying pre-certification breached the terms of the Freedom Plan.

■ Oxford has offered a number of inconsistent explanations for the denial of coverage to Mrs. Scalamandre. In answer to a pre-trial interrogatory, Oxford stated that all HDC/ABMT procedures had to be referred to programs approved by the National Cancer Institute ("NCI"), and that Montefiore's program would not be covered because it was not NCI-approved. Plaintiff's Exhibit 22 in Evidence.[11] At trial, however, Oxford's Medical Director, Dr. Sokolow, reversed Oxford's position, testifying that whether or not Montefiore had been approved by the NCI was irrelevant to the pre-certification decision. (Tr. 272). Furthermore, Dr. Ciobanu, who is the Director of the bone marrow transplant program at the Albert Einstein Cancer Center, Montefiore Medical Center, testified at trial that Montefiore Medical Center is in fact one of the twenty-five NCI-approved medical cancer centers. (Tr. 292–93).

Oxford also claims in its Post–Trial Memorandum that it denied pre-certification for Mrs. Scalamandre's HDC/ABMT because the treatment was not medically necessary. In support of its contention, Oxford points to a provision in the Freedom Plan which states that for the expense of treatment to be covered the treatment "must be recommended or approved by a Doctor as medically necessary" and "must also be medically necessary, in [Oxford's] judgment." *The Handbook* at 48. Once again, however, Oxford's position is inconsistent. At trial, Dr. Sokolow testified that he did not and was not able to make a determination that Mrs. Scalamandre's HDC/ABMT at Montefiore was not medically nec-

---

9. Moreover, Suzanne Adams knew that Mrs. Scalamandre would not even qualify under the protocol at Duke (and perhaps even at Hahnemann) because of her Adriamycin treatment. (Tr. 607–612).

10. Even if she had, both she and Dr. Sokolow admitted that Oxford never set up the mechanics of the second opinion even though under the Freedom Plan they were so required. (Tr. 218–219).

11. An NCI-approved institution is a comprehensive cancer center which is partially funded by the NCI. One privilege that NCI-approved institutions enjoy is the use of non-FDA approved drugs. In return, the institutions must submit to the NCI the statistical data on the results of the non-FDA approved drugs. (Tr. 252, 293). As of the date of trial, there were twenty-five NCI-approved centers in the United States. (Tr. 293).

essary, (Tr. 869), and that he never told anyone that Mrs. Scalamandre was denied the HDC/ABMT at Montefiore because the program was experimental. (Tr. 522); *See also* Plaintiff's Exhibit 2 in Evidence. As this was never a stated reason for declining coverage, Oxford may not come in now and argue that Mrs. Scalamandre was not entitled to benefits because the procedure was not medically necessary. Further, Oxford has not explained why, if the treatment was not medically necessary, it was apparently willing to certify the same treatment at either Duke or Hahnemann. Oxford did not even know whether there was any difference between the HDC/ABMT program at Montefiore and those at Duke and Hahnemann, Plaintiff's Exhibit 23 in Evidence, nor did Oxford even attempt to investigate the appropriateness of the Montefiore program. (Tr. 223, 604). While this inaction was not in and of itself a breach of the contract, it demonstrates that Oxford could not have even gathered the necessary information to make a determination that HDC/ABMT was medically necessary at Duke or Hahnemann and not at Montefiore.

In the end, Oxford seems to claim that the actual reason why it denied benefits to Mrs. Scalamandre was because the Scalamandres and/or their agents failed to obtain pre-certification from Oxford before being admitted to Montefiore for HDC/ABMT. Proposed Findings of Fact at 4. As stated above, the Freedom Plan defines a "non-certified occurrence" as "[e]ach instance in which the Medical Director was not contacted but should have been contacted in accordance with the terms of PRE–DETERMINATION OF MEDICAL TREATMENT [part 4 of the Freedom Plan]." *The Handbook* at 38. The terms referred to require at least 14 days advance notice of confinement and submission to the Medical Director of a statement of the reason for and the anticipated period of confinement. *Id.* at 46. Presumably, coverage could be denied if these terms were violated, but as stated above, the Scalamandres, through Mr. McCarthy, followed these procedures. Additional reasons why Oxford

might deny certification are not enumerated in the Freedom Plan.[12]

Finally, Oxford argues in its Post–Trial Memorandum that public policy supports its denial of pre-certification. *Id.* at 51. It argues that health care plans, such as the Freedom Plan, with utilization review and pre-certification components were developed expressly to control health care costs by preventing unnecessary and expensive procedures, and that the inappropriate procedure rendered in the case at bar is precisely the type of procedure that these plans have been designed to prevent. *Id.*

Without commenting on the merits of Oxford's public policy argument, all that needs to be said is that if Oxford desires to do its part to curtail unnecessary and expensive medical procedures, it may do so, but it must explicitly provide for this in its health benefits contract. For instance, if Oxford determines that Duke and Hahnemann are the only hospitals where it will pay for an HDC/ABMT, then it must say so in the contract and it better not say "Freedom Plan" members "retain the freedom each time [they] seek health care to choose any doctor, hospital or health care provider." *Id.* at 3. Moreover, Oxford's public policy argument does not permit it to decide unilaterally not to follow the procedures set forth in the health benefits contract it drafted itself.

Oxford has offered no consistent, reasonable explanation for denying benefits, and even if it has, it has breached the terms of the Freedom Plan by not following its established procedures. Oxford, therefore, has improperly denied coverage to Mrs. Scalamandre for her HDC/ABMT at Montefiore Medical Center, and Mr. Scalamandre, as Executor of his wife's estate, is entitled to damages as determined by this Court.

## III. DAMAGES

Mr. Scalamandre claims he is entitled to judgment against Oxford in the amount of $165,041.02 with interest, plus costs, disbursements and reasonable attorney's fees.

---

**12.** Moreover, as stated above, HDC/ABMT is not specifically listed as an expense not covered under the Freedom Plan.

## A. TOTAL UNPAID CLAIMS

 The Claims Manager for Oxford, Bernard Gilmore, acknowledged that Oxford has received timely filed proofs of claim for Mrs. Scalamandre's two hospitalizations and treatment in connection with the HDC/ABMT in an amount totalling $161,352.92, which remain unpaid. Plaintiff's Exhibit 27 in Evidence; (Tr. 782). Mr. Scalamandre claims that his company submitted an additional claim for a bill in the amount of $3,688.10, which Oxford claims it never received. Thus, Mr. Scalamandre claims that the total unpaid bill remains $165,041.02, and not merely $161,352.92.

Michael Carroll, an employee of Peter Scalamandre & Sons, Inc., testified that he mailed copies of all bills and claims in two separate groups. One group, which he mailed on February 10, 1992, contained 99 claims with the appropriate claim forms attached. (Tr. 886). The second group, which he mailed on February 18, 1992, contained three claims with the appropriate claim forms. (Tr. 887). Mr. Carroll maintains that the bill for $3,688.10 was included in this second group. (Tr. 887). He sent both groups of claims by certified mail, return receipt requested, and in both instances he received the return receipt with a signature of an Oxford employee.

All the claim forms are assembled together as Plaintiff's Exhibit 6 in Evidence and the return receipt for the second group of forms is Plaintiff's Exhibit 6A in Evidence. Attached to the second group of claim forms is a carbon copy of a hand written message signed by Michael Carroll stating that "enclosed are 3 more claims regarding [Carolee Scalamandre] in relation to her 2 stays at Montefiore Medical Center." Included in this group is the bill for $3,688.10 as well as two additional bills, both of which Oxford admits to having received. Since the two claims that Oxford admits to having received are attached to a hand written message which states that 3 claims are enclosed, the most obvious conclusion is that Oxford also received this third claim with the two additional claims. Therefore, the Court finds that the timely filed proofs of claim total $165,041.02, as alleged by Mr. Scalamandre.

 Under the Group Enrollment Agreement covering Peter Scalamandre & Sons, Inc., each individual is required to pay a deductible of $200 and a co-payment of %20 for all approved charges incurred at a institution outside the Oxford HMO. Plaintiff's Exhibit 5 in Evidence; (Tr. 716). Thus, ordinarily Oxford would be responsible for an amount equalling the total claims less $200, multiplied by %80. (Tr. 717). In this case, however, Mrs. Scalamandre has already used up her deductible. (Tr. 716). Moreover, under the Group Enrollment Agreement, the maximum out-of-pocket payment for each individual in a given year is $1,200, including the deductible. Plaintiff's Exhibit 5 in Evidence; (Tr. 716). Since Mrs. Scalamandre already paid her deductible, the maximum amount she is responsible for is $1,000, and since there was no testimony indicating that she has exhausted this maximum out-of-pocket expense, the Court will subtract $1,000 from the total claims of $165,041.02. Therefore, Mr. Scalamandre is entitled to $164,041.02 for the expenses associated with his wife's HDC/ABMT.

## B. PREJUDGMENT INTEREST

 An award of prejudgment interest is appropriate in ERISA cases. *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). However, "it is not axiomatic that such interest should be awarded simply because, as here, the prevailing party has demonstrated entitlement to the funds." *Mendez v. Teachers Ins. and Annuity Ass'n,* 982 F.2d 783, 790 (2d Cir.1992). "[P]rejudgment interest is a discretionary matter for the court and should be awarded only in cases where such an award is 'fair, equitable and necessary to compensate the wronged party fully.'" *Id.,* quoting *Wickham Contracting v. Local Union No. 3, IBEW,* 955 F.2d 831, 835 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). "An award of prejudgment interest ... must not result in over-compensation of the party to whom judgment has been awarded." *Id.*

■ In the case at bar, Mr. Scalamandre testified that out of the total bill of $165,041.02 he has already paid approximately $100,000. (Tr. 142). Therefore, in order to put Mr. Scalamandre in the position that he would have occupied but for Oxford's improper actions, it is necessary to award Mr. Scalamandre prejudgment interest on the amount that he has paid out of his own or his company's pocket. This payment of prejudgment interest to Mr. Scalamandre clearly does not result in his over-compensation since he made payments of approximately $100,000 that he should not have otherwise made, and has been forced by Oxford's actions to forego interest on this money that he would have otherwise earned.

■ Mr. Scalamandre contends that the interest should accrue from February 18, 1992, the date upon which all claims had been fully submitted to Oxford.[13] This Court determines, however, that the interest should accrue from the date or dates upon which Mr. Scalamandre made the payments, not from the date upon which he filed the claims, since Mr. Scalamandre did not incur damages until he paid money to Montefiore. *See* N.Y. CPLR § 5001(b) (McKinney 1992).

■ In regard to the rate of interest, the rule in the Second Circuit "is that the rate of interest used in awarding *prejudgment* interest rests firmly within the sound discretion of the trial court." *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir.1987) (emphasis in original). In exercising this discretion, federal courts in ERISA cases have employed the adjusted prime interest rates set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621 as an accurate measure of the cost of money over the relevant period of time. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F.Supp. 802, 815 (S.D.N.Y.1991); *McLaughlin v. Cohen*, 686 F.Supp. 454, 458 (S.D.N.Y.1988). Thus, the appropriate rate of interest to be applied is the adjusted prime rate set by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621, and this interest must not be compounded daily but should be simple interest. *See Id.* (26 U.S.C. § 6622, which provides that interest shall be compounded daily "applies expressly only to internal revenue tax cases and post-judgment interest allowed on money judgments ...").

Since counsel for Mr. Scalamandre has not clearly delineated for the Court the precise amount of payments Mr. Scalamandre has made or the dates upon which Mr. Scalamandre made said payments, he is hereby directed to submit to this Court an affidavit from Mr. Scalamandre stating the amount of payments he made on each date. He is directed further to submit his own papers calculating the simple interest due on each expense incurred by Mr. Scalamandre in accordance with the adjusted prime rate set by the Secretary of the Treasury, the amount of each expense, and the number of days between the date the respective expense was incurred and the date of the judgment. *See* N.Y. CPLR § 5001(b) (McKinney 1992).

## C. COSTS, DISBURSEMENTS AND ATTORNEY'S FEES

■ ERISA, 29 U.S.C. § 1132(g), provides:

> In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

Although a reward of attorney's fees is discretionary, the Second Circuit has held that "attorney's fees may be awarded to the prevailing party under ERISA in the absence of some particular justification for not doing so." *Birmingham v. SoGen–Swiss International Corp. Retirement Plan*, 718 F.2d 515, 523 (2d Cir.1983). Further, the Second Circuit has held that there are five factors to be considered in determining whether an award of attorney's fees is appropriate under § 1132(g)(1):

> 1. the degree of the offending party's culpability or bad faith;

---

**13.** While counsel for Mr. Scalamandre has stated on several occasions that Mr. Scalamandre is entitled to prejudgment interest from February 18, *1991*, the Court presumes that he intended to state that interest should accrue from February 18, *1992* since February 18, 1991 was well before any of the facts pertinent to this case transpired.

2. the ability of the offending party to satisfy an award of attorney's fees;

3. whether an award of attorney's fees would deter other persons from acting similarly under like circumstances;

4. the relative merits of the parties' positions; and

5. whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987). No one of the five factors is necessarily decisive, and some may not even be appropriate in a given case, but together they comprise "the nuclei of concerns that a court should address in applying [§ 1132(g) ]." *Greenblatt v. Prescription Plan Services Corp.,* 783 F.Supp. 814, 828 (S.D.N.Y.1992), quoting *Iron Workers Local # 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980). Thus, the five factors take "into account the relative merits of the parties' positions and also require findings about bad faith." *Chambless,* 815 F.2d at 872.

Applying the foregoing five factors, this Court determines that Mr. Scalamandre is entitled to costs, disbursements and reasonable attorney's fees. As to the second factor, Oxford has the ability to satisfy the award. As to the third factor, an award could and should in all likelihood deter Oxford and other insurers from not following its own procedures in the future and from improperly denying benefits. As to the fourth factor, Oxford's position is virtually without merit and plaintiff's case is clearly meritorious. The fifth factor appears to be insufficient. Thus, the sole question is whether Oxford acted in bad faith. In the Court's view, Oxford's inconsistencies in its positions and its refusal to make any reasonable attempt to comply with its own contract clearly show that it did act in bad faith. Accordingly, plaintiff is entitled to all of his attorney's fees and costs and should submit an affidavit of his attorney with time and other expense records that support any dollar amount claimed.

## IV. CONCLUSION

For the reasons discussed above, Mr. Scalamandre is entitled to judgment in the amount of $164,041.02 with prejudgment interest, plus costs, disbursements and reasonable attorney's fees. Plaintiff's attorney is directed to submit all affidavits and records as discussed above.

SO ORDERED.