70 F.3d 226
 19 Employee Benefits Cas. 2590, Pens. Plan Guide P 23914Y
Daniel J. SHARKEY, Plaintiff-Appellant,
v.
ULTRAMAR ENERGY LIMITED, LASMO PLC, LASMO (AUL LTD), aka
American Ultramar Limited, and Pension Committee
of the Ultramar U.S. Employees
Retirement Plan, Defendants-Appellees.
 No. 135, Docket 94-9212.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 6, 1995.
Decided Nov. 16, 1995.
 
 David S. Golub, Stamford, CT (Silver Golub & Teitell, Jonathan M. Levine, of Counsel), for Plaintiff-Appellant.
 A.J. Harper II, Houston, TX (Fulbright & Jaworski, LLP, Ralph C. Dawson, New York City, of Counsel), for Defendants-Appellees.
 Before: FEINBERG, KEARSE and LEVAL, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Plaintiff Daniel J. Sharkey appeals from a grant of summary judgment in the United States District Court for the Southern District of New York, Vincent L. Broderick, J., in favor of defendants-appellees Ultramar Energy Limited, Lasmo plc, Lasmo (AUL Ltd.), and the Pension Committee of the Ultramar U.S. Employees Retirement Plan. Sharkey sued for unpaid severance and pension benefits pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001 et seq., calculated on the basis that his employment was continuous from his original hiring date in December 1971 until July 31, 1992. Appellees contend Sharkey retired on June 1, 1988 and functioned as an independent contractor until reemployed on July 1, 1991 by Ultramar Energy Limited (UEL), a subsidiary of Ultramar plc (Ultramar).
 
 
 2
 The district court denied Sharkey's motions for summary judgment and granted appellees' motions in an opinion reported at 867 F.Supp. 258 (S.D.N.Y.1994).[1] For reasons given below, we reverse the grant of summary judgment and remand for further proceedings.
 
 I. Background
 
 3
 Sharkey was employed by UEL and another Ultramar subsidiary from December 1971 to June 1988, when he retired. At that time, Sharkey began receiving a monthly pension benefit of approximately $360 from the Ultramar U.S. Employees Retirement Plan (Retirement Plan) and also received a lump sum of approximately $126,700 from Ultramar's non-qualified pension plan. Sharkey also received a lump-sum severance payment of approximately $175,000 and signed a general release discharging all claims against the Ultramar companies. The release stated it applied to
 
 
 4
 all ... claims and demands whatsoever, in law, or equity ... which against the Ultramar Group [Sharkey] ... ever had, now ha[s] or hereafter shall, can or may have upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this release arising out of his employment with the Ultramar Group ... including ... severance benefits, excluding any benefits payable under a pension plan.... (emphasis added)
 
 
 5
 At about the same time, Sharkey formed Dan-Mar Enterprises, which entered into a consulting agreement with UEL whereby Sharkey agreed to provide part-time consulting services. Under this agreement, Sharkey could not be required to work more than 15 days per month and was to be paid on a per diem basis, with no benefits and no tax withholding. Sharkey reported this income on his tax returns as self-employed income.
 
 
 6
 Sharkey presented evidence that within a week or two the consulting arrangement evolved into full-time employment because his intended replacement was transferred to California. UEL had no one available to fill Sharkey's position, so what was envisioned as a short term, part-time consulting arrangement quickly turned into a permanent, full-time arrangement with Sharkey working for the company precisely as he had done prior to his retirement. Appellees dispute exactly when Sharkey resumed full-time work.
 
 
 7
 In the spring of 1991, the former Chairman of Ultramar, Lloyd Bensen, reviewed Sharkey's employment status. Bensen recommended that Sharkey be reinstated to the UEL payroll as a full-time employee and be given full credit for all of his years of employment, including the 1988-91 consulting period. Bensen noted Sharkey's financial losses from his treatment as an independent contractor for three years, including lost salary increases, annual bonuses, vacation, and sick day benefits, and his development of the "Atmospheric Fuel Vacuum Gasoil Economies" program, a refining concept which substantially increased the company's profits. Bensen therefore recommended that Sharkey be reinstated without being required to repay all or any part of the severance payment received in connection with his early retirement.
 
 
 8
 Sharkey was reinstated to UEL's payroll as an employee on July 1, 1991 and the monthly pension payments he had been receiving under the Retirement Plan were stopped. At the time Sharkey was reinstated, Ultramar had just adopted a severance pay plan (Severance Plan). The plan provided benefits based upon "years of completed service" to employees terminated within two years of a change in ownership of Ultramar. The Severance Plan was a "poison pill," designed by Ultramar to deter hostile takeovers by making it costly to purchase the company and sell off its assets or reduce its operations. Sharkey became a participant under this plan.
 
 
 9
 In late 1991, Ultramar was acquired in a hostile takeover by Lasmo plc (Lasmo), and in July 1992, Sharkey's employment with UEL was terminated. Sharkey received a payment under the Severance Plan of $42,499, which reflected only his year of service from July 1991 to July 1992. He was also told that he would not receive pension service credit under the Retirement Plan for the period from June 1, 1988 to June 30, 1991 or pension salary credit for the earnings received during that time. As a result, Sharkey's pension benefit was calculated at $16,127 per year. Had the omitted three-year consulting period been counted, Sharkey contends his benefit would be approximately $43,000 per year.
 
 
 10
 Sharkey appealed the determinations of his Severance Plan and Retirement Plan benefits to the respective plan administrators. These appeals were rejected in letters from appellees' present counsel.
 
 
 11
 In March 1993, Sharkey instituted an action in the district court challenging these determinations. Thereafter, the parties filed cross-motions for summary judgment. In November 1994, the district court granted summary judgment to appellees and denied Sharkey's motions for summary judgment. The court held that (1) the papers submitted by Sharkey were insufficient to support his claim that he actually was an employee during the 1988-91 period; and (2) he could not succeed on this claim because he had acquiesced in his employer's treatment of him as an independent contractor. Sharkey then appealed to this court.
 
 II. Discussion
 
 12
 Before us, Sharkey argues that the district court erred in granting appellees' motions for summary judgment and in denying his own. Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to demonstrate that no genuine issue exists and all ambiguities must be resolved and all inferences must be drawn in favor of the party against whom summary judgment is sought. Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994). We review a grant of summary judgment de novo to determine whether or not any genuine issue of material fact exists. Id. at 1224.
 
 A. The Pension Claim
 
 13
 Sharkey claims he was reinstated in July 1991 with full retroactive benefits, including continuous service and salary credit for the three-year consulting period. In support of this claim in the district court, Sharkey submitted, in addition to his own affidavit: affidavits from Bensen and another former Ultramar executive directly involved in Sharkey's reinstatement; Bensen's contemporaneous, pre-reinstatement memorandum recommending such treatment; and contemporaneous, post-reinstatement documents confirming that the recommendation had been implemented. Appellees submitted an affidavit from a former Ultramar executive stating that the reinstatement did not include retroactive benefit credit, thus raising what seems to be a factual dispute. However, appellees argue that since the Pension Committee of the Retirement Plan (Pension Committee or Committee) had discretion to interpret and administer the plan, the only issue before the district court was whether the decision of the Committee was arbitrary and capricious. Appellees contend that any reinstatement with retroactive benefits required a written plan amendment because the express terms of the plan do not allow a participant to receive retiree benefits while also accruing additional benefits. Since there was no such amendment, appellees argue that the factual dispute is immaterial. Even accepting Sharkey's assertions as true, they say, the Committee's decision was neither arbitrary nor capricious.
 
 
 14
 Sharkey responds that the decision in 1992 concerning his pension benefit was not made by the Pension Committee, but by executives of Lasmo, the "hostile" company that had taken over Ultramar in 1991. In support of this claim, Sharkey submitted to the district court the deposition of a member of the Pension Committee and a memorandum sent by the Committee to two Lasmo executives who were not members of the Committee. The memorandum included four possible benefit calculations for Sharkey and the Committee's preferred calculation. According to the deposition, the Lasmo executives did not accept the Committee's recommendation and selected a scenario providing Sharkey with a smaller pension benefit. In addition, Sharkey argues that appellees did not produce a formal Pension Committee writing evidencing a vote or decision in 1992 on the benefit due him, although there was such a writing approving the benefit he received in 1988.
 
 
 15
 Appellees are correct that the Retirement Plan grants the Pension Committee, the authorized fiduciary, sufficient discretion so that the arbitrary and capricious standard applies in reviewing its decisions. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); Jordan v. Retirement Committee of Rensselaer Poly. Inst., 46 F.3d 1264, 1269-71 (2d Cir.1995). Under this highly deferential standard, a decision of the Pension Committee must be upheld if reasonable. See Jordan, 46 F.3d at 1273. However, this is so only if the Pension Committee, and not some unauthorized party, made the challenged benefit determination. Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 584 (1st Cir.1993). Where an unauthorized party makes the determination, a denial of plan benefits is reviewed under the de novo standard. Rodriguez-Abreu, 986 F.2d at 584; Baker v. Big Star Div. of The Grand Union Co., 893 F.2d 288, 291 (11th Cir.1989) (as amended Jan. 29, 1990).
 
 
 16
 The factual issue of who actually made the benefit determination must be resolved before a court can properly decide whether or not to uphold the pension determination. While the decision that Sharkey was not entitled to retroactive pension benefits may not have been arbitrary or capricious,[2] it is much less clear that it can withstand de novo review. Moreover, we believe that the Pension Committee bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it. Cf. Scalamandre v. Oxford Health Plans (N.Y.), Inc., 823 F.Supp. 1050, 1060 (E.D.N.Y.1993).
 
 
 17
 We therefore reverse the grant of summary judgment on this claim and remand to the district court.
 
 B. The Severance Claim
 
 18
 The parties apparently agree, or at least they do not dispute, that the Severance Plan adopted in 1991 is governed by ERISA. The district court did not decide the issue,[3] evidently because in its view, as indicated above, Sharkey was not entitled to any relief regardless of whether the Severance Plan is governed by ERISA. However, as indicated below, the issue of whether ERISA applies to the Severance Plan is significant in construing the release given by Sharkey in 1988. Moreover, this issue is not a simple one, as is evident from our opinions in Reichelt v. Emhart Corp., 921 F.2d 425, 429-31 (2d Cir.1990), cert. denied, 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); James v. Fleet/Norstar Financial Group, Inc., 992 F.2d 463, 466-68 (2d Cir.1993); and Mullins v. Pfizer, Inc., 23 F.3d 663, 666 (2d Cir.1994). In Mullins, since the district court, as occurred here, erred in granting summary judgment, we remanded this issue, along with others, for the district court to consider. As will be seen in our discussion below, we believe the same disposition is appropriate here.
 
 
 19
 With regard to the Severance Plan, Sharkey principally argues to us that he cannot be denied severance benefits for his first 17 years of service because it is undisputed that he was an employee during those years. Appellees respond that the release Sharkey signed in 1988 waived any rights he may have had based on those years of service.
 
 
 20
 Under the Severance Plan, the plan administrator does not have discretionary authority to calculate benefits. Therefore, even if ERISA applies, the denial of severance benefits is subject to de novo review and the court must apply traditional principles of contract interpretation. Bruch, 489 U.S. at 112-13, 115, 109 S.Ct. at 955, 956. Moreover, summary judgment based upon construction of a contract is appropriate only if the meaning of the language is clear, considering all the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences that might reasonably be drawn from the language. Healy v. Rich Products Corp., 981 F.2d 68, 72 (2d Cir.1992).
 
 
 21
 In this case, the district court did not address the severance claim separately from the pension claim or independently assess the basis for appellees' denial of severance benefits. The court did not discuss Sharkey's contentions that the Severance Plan did not specify either that an employee's years of service had to be continuous or that, where service had been interrupted, a severance benefit had to be calculated from the start of the most recent date of hire. The district court merely stated that it was "implausible" that Sharkey would expect to receive any retroactive benefits without a written agreement. 867 F.Supp. at 259.
 
 
 22
 Appellees claim that regardless of whether the Severance Plan applies to all of Sharkey's years as an employee, he signed a release in 1988 under which he specifically gave up the right to make any severance claim based on his years of service prior to the release. Sharkey responds that, as a matter of law, he could not have knowingly waived his right to credit for his pre-1988 employment under the Severance Plan, because the plan did not exist until 1991. Sharkey also claims that the release does not clearly and unambiguously waive benefits under plans adopted after he was rehired by the company. Sharkey also points to an affidavit submitted to the district court, which stated that he did not intend to waive such rights. The district court did not discuss the effect of the release.
 
 
 23
 The validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims. Finz v. Schlesinger, 957 F.2d 78, 81 (2d Cir.), cert. denied, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992); Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1367 (2d Cir.1991). The essential question is "whether, in the totality of the circumstances, the individual's waiver of his right can be characterized as 'knowing and voluntary.' " Laniok, 935 F.2d at 1368. We see no reason to apply a lower level of scrutiny to waivers of severance claims under ERISA than we do to pension claims. Cf. Brown v. Van Nostrand Reinhold Co., No. 89-7309, 1991 WL 197592, at * 7 (S.D.N.Y. Sept. 24, 1991). But see Rodriguez-Abreu, 986 F.2d at 587. Thus, if ERISA applies to the Severance Plan, it is quite apparent that, after being fully advised of the circumstances surrounding the execution of the release, the district court must subject it to the "close scrutiny" called for by the cases cited above. Even if ERISA does not apply, as a matter of judicial administration, the effect of the release should be decided by the district court in the first instance.
 
 
 24
 The parties also raise other issues regarding the severance claim. Appellees strongly urge that Sharkey is "quasi-estopped" from pursuing his severance claim under the plan adopted in 1991, having already received approximately $175,000 in 1988 as a severance benefit. They also urge that even if Sharkey is entitled to severance benefits under the 1991 Severance Plan for his pre-1988 service, those benefits must be offset by the severance payment he received in 1988. In response, Sharkey contends that appellees waived all such defenses, including the right to enforce the release, by rehiring him in 1991 as recommended by Bensen, without requiring him to repay the amounts he had received in 1988, and that, in any event, in view of his financial losses from his treatment as an independent contractor, it is fair to disregard the 1988 severance payment. This welter of claims obviously raises a number of hotly disputed issues--some obviously factual, others perhaps purely legal--that should be addressed by the district court. On this record, we have no doubt that summary judgment in favor of appellees on the severance claim was inappropriate.
 
 C. Sharkey's Motions for Summary Judgment
 
 25
 Sharkey claims that the district court erred not only in granting appellees' motions for summary judgment, but also in denying his own. He argues that he was entitled to summary judgment because, as a matter of law, he was an employee for the three-year consulting period. In Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), the Supreme Court adopted a common-law test incorporating traditional agency law principles for determining who qualifies as an employee under ERISA. The Court adopted the test articulated in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).
 
 
 26
 In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.
 
 
 27
 Darden, 503 U.S. at 323-24, 112 S.Ct. at 1348 (footnotes omitted) (quoting Reid, 490 U.S. at 751-52, 109 S.Ct. at 2178-79).
 
 
 28
 In determining that Sharkey was not an employee during the disputed period and denying his motions for summary judgment, the district court relied almost exclusively on the consulting agreement between Dan-Mar Enterprises and UEL. 867 F.Supp. at 258-59. However, the employment status of an individual for the purposes of ERISA is not determined solely by the label used in the contract between the parties. Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1492 (11th Cir.1993); see also In re Shulman Transp. Enters., Inc., 744 F.2d 293, 295 (2d Cir.1984) (under agency principles, "employee does not become an independent contractor simply because a contract describes him as such"). Moreover, the corporate form under which Sharkey did business is not dispositive under the common-law agency test. Cf. Frankel v. Bally Inc., 987 F.2d 86, 91 (2d Cir.1993). Employment status depends on all of the factual incidents of the relationship. Darden, 503 U.S. at 324, 112 S.Ct. at 1348.
 
 
 29
 Furthermore, as already indicated, Sharkey contends that the part-time arrangement provided for in the consulting agreement changed almost immediately into full-time employment in which he held the same position and performed the same duties as he had as an employee prior to his retirement. Appellees dispute exactly when this change occurred. Appellees also dispute Sharkey's assertion that he worked exclusively for UEL in 1988-91. The factual issues thus raised could not properly be determined on a motion for summary judgment--either by Sharkey or by appellees. We therefore conclude that the district court did not err in denying Sharkey's motions for summary judgment.
 
 III. Conclusion
 
 30
 To summarize, we hold that the district court erred in granting appellees' motions for summary judgment and did not err in denying Sharkey's motions. We therefore reverse and remand for further proceedings.
 
 
 
 [1]
 Sharkey's complaint contained two claims for relief, one dealing with his severance claim and one dealing with his pension claim. Separate motions addressed to each claim were made by both parties
 
 
 [2]
 Sharkey also contends that the Pension Committee did not consider evidence of the circumstances of his reinstatement, and therefore its decision was, in any event, arbitrary and capricious. Because we find that an issue of fact exists with regard to who made the benefit determination, we do not reach this argument, which Sharkey is free to make in the district court on remand
 
 
 [3]
 The district court stated, "[t]he pension fund involved here, and possibly the severance pay arrangement, are governed by ERISA." 867 F.Supp. at 259