**BROOKRIDGE FUNDING CORP., Plaintiff,**

v.

**NORTHWESTERN HUMAN SERVICES, Defendants.**

**No. 3:99CV2339(CFD).**

United States District Court, D. Connecticut.

Dec. 4, 2001.

William J. Hagan, Danbury, CT, Douglas R. Steinmetz, Meiselman, Denlea, Packman & Eberz, White Plains, NY, for Plaintiff.

Donald E. Frechette, Janet Marie Helmke, Edwards & Angell, Hartford, CT, Robert B. Bodzin, Nicole R. Rodrigue, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA, for Defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

DRONEY, District Judge.

### I. Introduction

This action arises out of several agreements relating to the financing for the construction of a baseball stadium in Allentown, Pennsylvania, known as the Lehigh Valley Stadium Project. Plaintiff Brookridge Funding Corporation ("Brookridge"), an accounts receivable factoring firm, brings this suit against Northwestern Human Services ("Northwestern"), the owner of the land on which the stadium has been partially constructed. Brookridge seeks to collect $2,759,024.43 from Northwestern on account invoices allegedly owed by Northwestern to the stadium project's construction manager, Contracting Systems, Inc. II ("CSI"). Brookridge claims to have purchased these account invoices from CSI.

The Second Amended Complaint, filed on April 13, 2000 ("the Complaint"), contains three counts against Northwestern: breach of contract, account stated, and unjust enrichment. Northwestern has asserted various affirmative defenses in its January 29, 2001 Amended Answer and Affirmative Defenses ("the Answer").[1]

This Court has diversity jurisdiction over this matter, as the plaintiff is a Delaware corporation with its principal office in Connecticut, the defendant is a Pennsylvania corporation with an address in that state, and the amount in controversy exceeds $75,000.[2] See 28 U.S.C. § 1332.

Two motions are currently pending: the Motion for Summary Judgment of Defen-

---

1. Although one of those defenses is lack of personal jurisdiction over Northwestern, neither party has raised that issue in the pending motions.

2. In its Answer, Northwestern denies the allegation relating to Brookridge's state of incorporation and the location of its principal office on the basis that it lacks information sufficient to verify these facts. Answer ¶ 2. It does not challenge the Court's subject matter jurisdiction in its pending motion for summary judgment.

dant Northwestern Human Services [Doc. #37] and Brookridge's Motion for Summary Judgment [Doc. #40]. For the following reasons, the defendant's motion is DENIED and the plaintiff's motion is GRANTED IN PART, DENIED IN PART.

## II. *Background* [3]

As explained above, Brookridge is an accounts receivable factoring firm that allegedly purchased certain account invoices from CSI. As a factor, Brookridge buys accounts receivable from clients at a discounted price. *See* Black's Law Dictionary (7th ed.1999). The price is discounted because factors (such as Brookridge) assume the risks of delay in collection and loss on the accounts receivable. *See id.* Northwestern is a not-for-profit corporation that owns the land upon which the stadium project has been partially constructed, but the parties dispute whether Northwestern has a greater role in the development of the stadium. Northwestern's Chief Executive Officer is Robert Panaccio ("Panaccio"). CSI is the stadium project's construction manager that was to be paid $10,500,000 for its services by the owner of the stadium property under the "Standard Form of Agreement Between Owner and Construction Manager," dated December 15, 1998. *See* Def.'s Memo. Opp. Summary Judgment, Ex. D. The December 15, 1998 agreement lists the owner as Federal Development Company as "Agent for" Northwestern, and the agreement is signed by a representative of Federal Development Company ("Federal"), though the signature is illegible. Other than Federal, no representative from Northwestern appears to have signed this document. Federal appears to be linked to Northwestern through Thomas Flaherty ("Flaherty"), a former member of the Board of Directors of Northwestern and a principal of Park Place Builders, Inc. d/b/a Federal Development Company ("Federal"). The precise nature of Federal's role in the stadium project is unclear. In particular, the parties dispute whether Flaherty persuaded Northwestern to enter into a formal agreement to develop the stadium and whether Federal had the authority to enter into the December 15, 1998 agreement with CSI on behalf of Northwestern.

In June 1999, CSI entered into an Accounts Receivable Purchase Agreement ("Accounts Receivable Agreement") with Brookridge. *See* Compl. Ex. A. Under the terms of that agreement, CSI agreed to submit account invoices to Brookridge for possible purchase, and Brookridge had the authority to determine whether the accounts were "acceptable" for purchase. *Id.* at 1. If Brookridge purchased an account, it agreed to advance 70 percent of the face value of the accounts to CSI at the time of purchase, and the balance upon full payment by the account debtor, minus a "Factors' fee." *Id.* CSI also granted Brookridge a security interest in its accounts and other property. *Id.* at 5. In addition, the Accounts Receivable Agreement also provides that Brookridge may seek recourse against CSI when an account is not paid in full. *Id.* at 2.[4]

---

**3.** The recited facts are taken from the parties' Local Rule 9 statements and the materials appended thereto, and are undisputed unless otherwise noted. Northwestern did not file a Local Rule 9(c)(2) Statement in response to Brookridge's Local Rule 9(c)(1) Statement. Therefore, the statements contained in Brookridge's statement are deemed admitted. D. Conn. L. Civ. R. 9(c)(1).

**4.** The Accounts Receivable Agreement also provides, "It is specifically understood and agreed that Accounts purchased by Factor and not yet paid shall not exceed the total sum of one million dollars ($1,000,000.00) at any time." Compl. Ex. A at 6. Northwestern

According to Brookridge, in June 1997, CSI submitted requests for Brookridge to purchase two of its accounts receivable, namely, two accounts allegedly owed by Northwestern to CSI, presumably under the terms of the December 15, 1998 agreement. *See* McNiff Aff., Ex. A. These accounts were valued at $1,425,112.60 (set forth in application # 5) and $1,333,911.83 (set forth in application # 6), resulting in a total value owed to CSI of $2,759,024.43. *Id.* In July 1999, Northwestern, Brookridge, and CSI executed a Notice of Purchase of Accounts Receivable ("the Notice"). *See* Compl. Ex. B. The Notice stated, in part, the following:

> Notice is hereby provided to you that Brookridge Funding Corporation ("BFC") has purchased the accounts receivable of Contracting Systems, Inc. II (Assignor). By its signature below, Assignor hereby instructs you ... to make all payments owing pursuant to the attached invoice in the amount of *$2,759,024.43* by the Undersigned to the Assignor directly to BFC as per the instructions provided below.
>
> To induce BFC to provide financial services to Assignor, including without limitation the purchase of its accounts, the Undersigned [purportedly Northwestern] hereby represents and warrants to BFC as follows:
>
> 1. As of the date hereof the amount owing on the attached invoice by the Undersigned to Assignor, and the amount to be paid to BFC pursuant to the obligations of the Undersigned is *$2,759,024.43*. Such sum is owed absolutely and the Undersigned has no right of counterclaim, contraclaim,

setoff or any other right of deduction from such sum.

> 2. The Undersigned acknowledges that the *$2,759,024.43* owing by the Undersigned to Assignor shall be paid directly to BFC. This assignment may only be released by BFC and no action of Assignor shall affect any of the Undersigned's obligations to make payment directly to BFC.

*See* Compl. Ex. A. The Notice was signed by representatives of Brookridge and CSI, and by Mr. Panaccio of Northwestern. Brookridge claims that execution of this Notice was a precondition to its decision to purchase the two accounts receivable from CSI. Brookridge's President John A. McNiff III also claims to have discussed the Notice with Mr. Panaccio prior to its execution, but Mr. Panaccio disputes his recollection of their conversation. *See* McNiff Aff. ¶¶ 11–13; Panaccio Aff. ¶¶ 10–15. The parties agree, however, that Northwestern has refused to pay the sum of $2,759,024.43 to Brookridge.

In addition to this action, Northwestern has brought a separate suit against CSI and CSI's President, John W. Clarke, in the United States District Court for the District of Connecticut seeking damages on the basis that CSI failed to pay the amount owed to Brookridge. *See* Statement Uncontested Facts Supp. Mot. Summ. J., Ex. D, *Brookridge Funding Corp. v. Contracting Systems, Inc. II & John C. Clarke,* Civil Action No. 3:00CV2252(SRU). Further, CSI has filed a claim under the construction contract against Northwestern with the American Arbitration Association. *See* Statement

---

contends that this provision indicates that its liability to Brookridge could not exceed $1 million. Brookridge maintains that the limitation is of no relevance, and that it "represents a limitation of the amount of receivables which CSI can submit to Brookridge with the expectation that Brookridge will consider them for purchase." Pl.'s Memo. Opp. Def.'s Mot. Summ. J. at 8.

Uncontested Facts Supp. Mot. Summ. J., Ex. E.

### III. *Standard*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact.' " *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the non-moving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). Additionally "where ... the non-movant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir.1999) (citing *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548 and *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir.1998)).

### IV. *Discussion*

In its motion for summary judgment, Northwestern argues that Brookridge's claims of breach of contract and account stated fail as a matter of law because the Notice lacks consideration and because there was no "meeting of the minds" among the parties who executed the Notice. It also contends that Brookridge's claim of unjust enrichment fails because Northwestern did not incur any benefit from Panaccio's execution of the Notice.

Brookridge maintains that it is entitled to summary judgment on its breach of contract claim because the Notice is an enforceable waiver of defenses under Conn. Gen.Stat. § 42a–9–206, which makes Brookridge a holder in due course and prevents Northwestern from asserting the defenses it has raised. In addition, Brookridge argues that even if it is not a holder in due course and Northwestern is permitted to assert its defenses, it is entitled to judgment as a matter of law on its claims of breach of contract because the Notice was supported by consideration (or in the alternative, it detrimentally relied on the Notice) and because the Notice is unambiguous. It also maintains that even if extrinsic evidence is considered, that evidence supports the plaintiff's position. Finally, Brookridge argues that it is entitled to judgment as a matter of law on its claims of account stated and unjust enrichment, and on Northwestern's defense that is based on the arbitration before the American Arbitration Association.

A. *Applicability of Article 9 of the Uniform Commercial Code ("UCC") and Connecticut General Statutes*

As an initial matter, the parties dispute whether Article 9 of the UCC and Connecticut General Statutes, entitled "Secured Transactions; Sales of Accounts, Contract Rights and Chattel Paper," governs this dispute. Brookridge argues that Article 9 applies, while Northwestern maintains that the common law of assignments should control in determining the rights and duties of the parties. If the Court determines that Northwestern has executed an enforceable waiver of defense under Conn. Gen.Stat. § 9–206, it could not maintain its defenses against Brookridge. Conversely, if that section of Article 9 does not apply to the dispute, common law rules of assignment would permit Northwestern to assert any defense against Brookridge, the assignee, as it could have asserted against CSI, the assignor.[5] The first issue is whether Article 9 applies to the Notice, and if so, to what extent.

■ In general, Article 9 applies:

(a) to any transaction, regardless of its form, which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper; and also (b) to any sale of accounts or chattel paper.

Conn. Gen.Stat. § 42a–9–102(1). An account is "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." *Id.* § 42a–9–106.

Here, the two account invoices submitted by CSI for possible purchase by Brookridge indicate the nature of CSI's alleged right to payment for services it rendered in connection with the stadium project. *See* McNiff Aff., Ex. A. This right is evidenced by the December 15, 1998 contract between CSI and Federal, purportedly as an agent for Northwestern. *See* Compl. Ex. A. The parties appear to agree that this transaction involved no negotiable instrument or chattel paper. Thus, Brookridge's purchase of the two account invoices from CSI is a sale of accounts to which Article 9 applies. At least one commentator has explained why Article 9 properly includes such a transaction.

> Article 9 applies to sales of accounts and chattel paper primarily because of their financing character. The reasons for this rule are most obvious with respect to certain sales of accounts and chattel paper done by "factors." "Factors" are lenders in sheep's clothing; routinely they "buy" accounts without recourse.[6]

4 J. White & R. Summers, Uniform Commercial Code § 30–9 (4th ed.1995) (footnote omitted). Several cases have applied Article 9 to such transactions. *See In re De–Pen Line, Inc.*, 215 B.R. 947, 949–50 (Bankr.E.D.Pa.1997) (citing cases). The applicability of Article 9 is further supported by the fact that the Accounts Receivable Agreement provided that Brookridge would have a security interest in CSI's accounts. While Northwestern argues that Article 9 does not apply to the Notice because the Notice itself is neither a sale of accounts nor an assignment, the underlying transaction here is the Ac-

---

**5.** Conn. Gen.Stat. § 9–318 contains a similar rule applicable in situations where no waiver of defense clause has been executed.

**6.** Here, however, it appears that the Accounts Receivable Agreement provides for recourse by Brookridge against CSI, which appears to form the basis of the complaint in the other case pending in the District of Connecticut. *See* Statement Uncontested Facts Supp. Mot. Summ. J., Ex. D.

counts Receivable Agreement between CSI and Brookridge and the Notice was executed by the parties in connection with that agreement. The fact that the Notice may be ambiguous does not affect this analysis. Thus, Article 9 applies to CSI's sale of its accounts to Brookridge as well as to the Notice. However, as indicated below, there exist genuine issues of material fact as to the rights and remedies under Article 9.

### B. *Waiver of Defenses under Conn. Gen.Stat. § 42a–9–206*

The next issue is whether the Notice is an enforceable waiver of defenses as a matter of law under Conn. Gen.Stat. § 42a–9–206, as Brookridge maintains. The resolution of this issue begins with examination of Conn. Gen.Stat. § 42a–9–318, which provides,

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 42a–9–206 the rights of an assignee are subject to (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment. . . .

(3) The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must season-

ably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

Conn. Gen.Stat. § 42a–9–318(1), (3); *see also Fairfield Credit Corp. v. Donnelly,* 158 Conn. 543, 264 A.2d 547, 549–50 (1969). Under Conn. Gen.Stat. § 42a–9–206,

(1) Subject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under article 3. A buyer who as part of one transaction signs both a negotiable instrument and a security agreement makes such an agreement.

Conn. Gen.Stat. § 42a–9–206(1).[7] Thus, " § 9–206(1) is intended to give qualified assignees the protection generally accorded a holder in due course." *Equico Lessors, Inc. v. Rockville Reminder, Inc.,* 4 Conn.App. 102, 492 A.2d 528, 529 (1985); *see also Fairfield Credit,* 264 A.2d at 550.

■ Here, Brookridge maintains that the Notice, and in particular its language stating that Northwestern agrees not to assert any counterclaim or setoff, constitutes a waiver of defenses under § 42a–9–206(1). Under this reasoning, Northwestern's waiver is valid and enforceable if Brookridge took its assignment of the two account invoices in good faith and for value, without notice of any defense to be asserted by Northwestern. Northwestern

---

**7.** UCC § 9–206 and 9–318 have recently been revised, though Connecticut has yet to incorporate these revisions in its statutes. Accordingly, the former section designations will be used, and the Court will note when the revisions would affect the analysis.

maintains that the waiver of defense is not enforceable under § 42a–9–206(1) because Northwestern has not signed a negotiable instrument and a security agreement as provided in the last sentence of that section, and because the waiver is not supported by consideration and contains language which is both ambiguous and contradictory.[8]

■ As to the fact that Northwestern has not signed a negotiable instrument and a security agreement in connection with the purported waiver, Brookridge maintains that this provision is not intended as a requirement for all buyers executing waivers. This position is supported by the UCC Comment to § 9–206, which, after explaining the situations in which waiver of defense clauses may be operable, provides that "[t]he execution of a negotiable note in connection with a security agreement is given like effect as the execution of an agreement containing a waiver of defense

clause." This language makes it clear that a buyer's signing of a negotiable instrument and a security agreement together is equivalent to his or her signing a waiver of defense clause-they are not necessary conditions of enforceablity for any clause that is signed.[9]

■ The issue of consideration requires a discussion that goes beyond the arguments of the parties. It appears that § 9–206 was intended to encompass waivers contained in contracts between a debtor and an assignor that are assigned-not in separate agreements made in anticipation of such an assignment, as was the Notice in this case.[10] *See* Hawkland, Uniform Commercial Code Series, § 9–206(1) (2001) (describing waiver of defense clauses before the enactment of § 9–206 was agreements "by which the obligor agreed in advance that he would not raise … as against the assignee any claim or defense

---

**8.** As initial matter, there is little authority discussing the applicability of § 42a–9–206(1) or an equivalent provision to a separate alleged waiver of defense executed by an account debtor who is "buyer" of services rather than a "buyer" of goods. In a factually similar case, however, one court determined that such a waiver did not apply because by its terms an equivalent provision pertained to waivers signed by buyers of goods-not services. *See Suburban Trust & Sav. Bank v. University of Delaware*, 910 F.Supp. 1009, 1015–16 (D.Del.1995). Despite its conclusion, the court acknowledged that at least two commentators have advocated extending this provision to other buyers. For example, Professor Grant Gilmore stated,

The present wording of the § 9–318(1) cross reference can unfortunately be read to mean that only "account debtors" who are buyers of goods can ever waive their contract defenses. The purpose of this tedious discussion is to suggest that such a senseless restriction was never intended and that the careless wording of the cross reference, to the extent it suggests such a restriction, should be disregarded.

Grant Gilmore, Security Interests in Personal Property § 41.5, at 1094–95 (1965). The par-

ties here have not addressed this issue. The Court declines to follow the court's conclusion in *Suburban Trust*, and concludes that the waiver of defenses clause can be applied to the waiver executed by Northwestern. This conclusion is further supported by the fact that revised section § 9–206, designated as § 9–403, does not limit waivers to buyers of goods. UCC § 9–403 cmt. 2.

**9.** Under § 42a–9–102(3), "[t]he application of [ ] article [9] to a security interest in a secured obligation is not affected by the fact that the obligation itself is secured by a transaction or interest to which this article does not apply." Thus, the fact that the purported agreement between CSI and Federal (and perhaps Northwestern) does not contain a secured obligation, does not affect the issues here.

**10.** This also appears to be the case in revised § 9–403. Under this provision, "an assignee who takes a simple contract containing a waiver of defense clause in good faith, for value and without notice is accorded quasi-holder-in-due-course status." 9A Hawkland UCC Series Revised § 9–403:2 (2001).

that he might have against the assignor"). Accordingly, it would seem that a waiver of defense clause executed subsequent to the original contract that has been assigned must be considered a modification of that original contract. The question then becomes whether consideration is needed to support such a modification. At least one court has held that none is needed to support a waiver of defense clause. *Chemical Bank v. Rinden Prof. Ass'n*, 126 N.H. 688, 498 A.2d 706, 712 (1985). However, the court in *Chemical Bank* relied upon the construction of UCC § 2-209(1), which provides that "[a]n agreement modifying a contract within this article needs no consideration to be binding." *See also* Conn. Gen.Stat. § 42a-9-209(1). Article 2 applies to "transactions in goods" and does not apply "to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a secured transaction." Conn. Gen.Stat. § 42a-2-102. Here, the waiver of defenses would modify the contract between CSI and Federal, purportedly as an agent for Northwestern. It is not a transaction of goods; instead, it provides for the duties of CSI as construction manager for the stadium project. Therefore, Article 2 does not apply and the common law rule of consideration must be applied, which provides that "[a] modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." *New England Rock Serv., Inc. v. Empire Paving, Inc.*, 53 Conn.App. 771, 731 A.2d 784, 787, *cert. denied*, 250 Conn. 921, 738 A.2d 658 (1999).

■ There is a genuine issue of material fact as to the benefit received by Northwestern in consideration for its alleged agreement to waive its right to defenses against Brookridge. "[C]onsideration has been defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Finlay v. Swirsky*, 131 A. 420, 423 (1925). The Notice provides that Northwestern signed the Notice "[t]o induce [Brookridge] to provide financial services to Assignor [CSI]." Compl. Ex. B. Brookridge maintains that Northwestern benefitted from this arrangement because the financing provided to CSI under the terms of the Accounts Receivable Agreement would allow the stadium project to go forward. Whether such a benefit exists depends upon the relationship between Federal and Northwestern, which is unclear at this time. In addition, while an exchange of promises also is sufficient consideration to support a contract, *see Osborne v. Locke Steel Chain Co.*, 153 Conn. 527, 218 A.2d 526, 531 (1966), it is not clear what promise Brookridge made to Northwestern.

■ In the alternative, however, Brookridge maintains that it relied upon Northwestern's promise that it would pay the account invoices attached to the Notice to Brookridge. Under the doctrine of detrimental reliance, "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Brookridge Funding Corp. v. District of Columbia Housing Authority*, No. CV990337858S, 2000 WL 1978646, at *1 (Conn.Super.Ct. Dec. 22, 2000) (quoting *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 520 A.2d 217, 221 (1987) (internal quotation omitted)). "It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably

available means of acquiring knowledge." *Chotkowski v. State*, 240 Conn. 246, 690 A.2d 368, 380 (1997) (citation omitted). Here, it is not clear whether Brookridge knew "the true state of things," and in particular whether it was Federal or Northwestern that was obligated on the invoices.[11] Northwestern apparently does not dispute that Brookridge relied upon the Notice (only that they should have known that Federal and not Northwestern was obligated for payment on the two account invoices), and thus there is a genuine issue of material fact that Brookridge did act in reliance on this promise by purchasing the account invoices at issue.[12] *See* McNiff Aff., Ex. B.

### C. *Contract Ambiguity*

Northwestern also maintains that the Notice is ambiguous: it states that Brookridge has purchased the account invoices of CSI, but at the same time, it states that Northwestern's signature is needed to "induce" Brookridge to provide "financial services" to CSI "including without limitation the purchase of [CSI's] accounts." Compl. Ex. B. In addition, Northwestern points out that the two account invoices purchased by Brookridge were not attached to the Notice signed by Panaccio.

 "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms and resort to parol evidence is not only unnecessary but improper." *Lee v. Bsb Greenwich Mortgage L.P.*, 267 F.3d 172, 178 (2d Cir.2001). "Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Brunoli v. Brunoli & Sons*, 993 F.Supp. 66, 73 (D.Conn.1997) (quoting *Care Travel Co. v. Pan Am. World Airways*, 944 F.2d 983, 988 (2d Cir.1991)). In contract actions involving the interpretation of contractual language, summary judgment is appropriate only when the language of a contract is wholly unambiguous when considered in light of the surrounding circumstances and undisputed evidence of intent. *Orange Improvements P'ship v. Cardo, Inc.*, 984 F.Supp. 85, 89 (D.Conn.1997) (citing *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995)). The moving party has the burden of establishing that the language of the contract is not susceptible to at least two fairly reasonable meanings. *See id.* If that party cannot establish unambiguous contract language, a material issue exists as to the parties' intent and the non-moving party may introduce extrinsic evidence on that issue at trial. *See id.* (citing *Wards Co. v. Stamford Ridge-*

---

**11.** This case is distinguishable from *Brookridge Funding*, 2000 WL 1978646 at *1, in this way. In that case, though the court concluded that an account debtor's signature on a similar notice should be enforced because the debtor's signature induced Brookridge's reliance, there apparently were no question as to whether the account debtor was the party obligated on the account.

**12.** Brookridge has apparently chosen to base its action solely on the Notice-not any other document executed by the parties. For instance, it has asserted that "[t]he contractual relationship between ... CSI[ ] and Brook-

ridge is irrelevant to this action." Pl.'s Memo. Opp. Def.'s Mot. Summ. J. at 1. It is conceivable that the Notice, rather than being an agreement setting forth contractual rights, is properly understood as a notification of assignment, which must be given to a debtor under § 9–318(3). This uncertainty is further reason why summary judgment is not appropriate at this time. It is also important to note, however, that the Notice cannot function as an agreement requirement consent for an assignment, as such provisions are inoperable under § 9–318(4).

*way Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985)).

■ The terms of the Notice are ambiguous. First, it is not clear whether Brookridge had already purchased an account invoice when it asked Northwestern to sign the Notice, or whether it planned to do so based on Northwestern's execution of the Notice. While the document is entitled "Notice of Purchase of Accounts Receivable" and states that Brookridge "has purchased the accounts receivable" of CSI, it also provides that Northwestern's execution of the Notice is "To induce [Brookridge] to provide financial services to" CSI. In addition, while the document is entitled a "Notice," Brookridge is claiming that it is really an agreement from which significant obligations arise. Further, while the Notice states refers to only one account, the listed value of that account is $2,759,024.43–the amount of the two accounts at issue here combined. The situation is further confused by the fact that no invoices were attached to the Notice. These issues are material because they relate to the amount of Northwestern's obligation to Brookridge, as well as to the benefit enjoyed by Northwestern as a result of its execution of the Notice. While some of the extrinsic evidence presented by the parties appears to clarify these issues, evidence of the intent of the parties is not undisputed, and thus the Court must reserve its consideration of extrinsic evidence for trial.

■ Finally, with respect to the requirements for an enforceable waiver of defenses clause under 42a–9–206, there are genuine issues of material fact as to whether Brookridge took its assignment from CSI without notice of any claims and defenses, as it is unclear whether Brookridge knew or should have known that Northwestern may question Federal's authority to enter into the contract with CSI or whether Northwestern was aware it would be obligated under the Notice to Brookridge. As a result, the Court will not reach the merits of Northwestern's other arguments and defenses, as they could be precluded if the court determines that Brookridge is indeed a holder in due course.

Further, given that the Court has not yet determined whether the Notice is enforceable, it will not reach the plaintiff's claims of account stated and unjust enrichment. In particular, as to the latter, issues of fact remain as to whether there was a benefit to Northwestern as the result of its execution of the Notice. Accordingly, plaintiff's motion for summary judgment on that count also is denied.[13]

## V. *Conclusion*

For the foregoing reasons, the defendant's motion for summary judgment [Doc. # 37] is DENIED and the plaintiff's motion for summary judgment [Doc. # 40] is GRANTED IN PART, DENIED IN PART. The plaintiff's motion is granted only to the extent that Article 9 applies to the Notice.

In addition, the Court hereby directs the parties to show cause by ***December 24, 2001*** why the related action currently

---

13. The plaintiff's attorney represented in the hearing on the cross-motions for summary judgment that its ability to recover from CSI in the second federal action is dependent upon its recovery in this case. Given that the scope of the agreement between CSI and Northwestern is still unclear, the Court will not determine here how these two actions are related. Further, summary judgment is not appropriate with respect to the Northwestern's defense that all claims related to the CSI–Federal agreement should be asserted before the American Arbitration Association, as the relationships among the parties are currently disputed.

pending in this District, *Brookridge Funding Corp. v. Contracting Systems, Inc. II & John C. Clarke,* Civil Action No. 3:00CV2252(SRU), should not be consolidated with this case, and why CSI should not be joined as a necessary party to this action. In addition, the parties are to provide an update on the status of CSI's claim before the American Arbitration Association.