**George F. RILEY, Plaintiff–Appellant,**

v.

**HEWLETT–PACKARD CO.,**
**Defendant–Appellee.**

No. 00–2488.

United States Court of Appeals,
Sixth Circuit.

June 6, 2002.

Before RYAN, BOGGS, and COLE,
Circuit Judges.

PER CURIAM.

Riley appeals the grant of summary judgment to Hewlett–Packard (HP) in this contract dispute. The district court granted HP summary judgment on the basis that the accounts receivable at the center of the dispute were assigned in violation of an anti-assignment clause in a subcontracting agreement between Clover Technologies, Inc. (Clover) and HP. The anti-assignment clause is clear and valid. We therefore affirm the judgment of the district court.

I

In 1996, HP executed a master subcontractor agreement with Clover. The agreement required Clover to provide labor, materials, and technical assistance for projects that HP might decide to subcontract out to Clover. The agreement contained an anti-assignment clause that stated:

Unless otherwise agreed in writing by HP, Subcontractor shall not assign its

rights or delegate its responsibilities under this Agreement. Any purported assignment or delegation by Subcontractor, including the attempted subcontracting of all or any portion of the work to provided [sic] under this Agreement, shall be null and void.

During the course of the contract, Clover and HP quarreled over whether or not HP was required to pay for certain work done by Clover. HP argued that the work was beyond the scope of the HP–Clover agreement; Clover, of course, disagreed.

During this dispute, Clover was sold by Riley (who owned 97% of Clover's stock) and Leonard Kruszewski (who owned 3%) to Ameritech. The payment for the company was made in two steps. The purchase price for Clover was $74,750,000, less a "holdback amount" of $17,500,000 that represented, among other things, the uncollected accounts receivable assigned to Ameritech as part of the purchase.

At the end of 15 months, those accounts receivable that remained uncollected were to be returned to the George F. Riley Business Trust and Kruszewski, in full satisfaction of the holdback amount, along with cash in payment for those accounts receivable that had been collected. The HP accounts receivable were returned (along with nearly $2 million in other uncollected accounts) as part of that process, because they were still disputed by HP and therefore remained uncollected.

On April 25, 2000, Riley filed suit against HP on behalf of himself and the Riley Trust. HP filed a motion for summary judgment based on the anti-assignment clause. The district court agreed with HP that the anti-assignment clause was clear and valid, and dismissed Riley's action. Riley timely appealed.

## II

We review a district court's grant of summary judgment de novo. *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001). Summary judgment is appropriate when no genuine issue of material fact remains between the parties. Fed. R.Civ.P. 56(c). All inferences must be drawn in favor of the non-moving party. *Napier*, 238 F.3d at 741–42.

The accounts receivable were assigned; the anti-assignment clause has clearly been violated. The remaining issue is whether there is any impediment to the enforcement of the anti-assignment clause. Riley raises four objections to the enforcement of the anti-assignment clause. First, he states that the clause is ambiguous and should therefore be invalidated based on certain interpretive rules against anti-assignment clauses. Second, he argues that Uniform Commercial Code § 9–318 as adopted by Michigan invalidates anti-assignment clauses. Third, he argues that, on the equities, the anti-assignment clause ought to be voided by the court. Fourth, he argues that Clover was no longer bound by the provisions of the contract because it had already performed. None of these arguments are convincing.

A. The Anti–Assignment Clause: General Contract Principles and Interpretive Rules

There is a general policy favoring the free alienability of contract rights to payment. The essential intuition seems to be that changing the payee does not impose serious consequences on the payor. *See, e.g., Fox–Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346 (D.C.Cir. 1971). Since free alienability creates other significant benefits, it is generally favored by interpretive rules. *Ibid.* Therefore, the Second Restatement of Contracts has adopted an interpretive rule: in cases of

ambiguity, anti-assignment clauses are construed to mean that duties, not rights to payment, are non-assignable. Specifically: "Unless the circumstances indicate the contrary, a contract term prohibiting assignment of 'the contract' bars only the delegation to an assignee of the performance by the assignor of a duty or condition." RESTATEMENT OF CONTRACTS (SECOND) § 322(1) (1981).

The Restatement also notes that a "contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, . . . is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition." RESTATEMENT OF CONTRACTS (SECOND) § 322(2)(c) (1981).

These rules of interpretation do not override express statements of the will of the parties. If the contract shows an intent by the parties to limit both delegations of duties and assignment of rights, and specifically states who is bound by the assignment prohibition, then the interpretive default rules are inapplicable. *Fox–Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346 (D.C.Cir.1971). Similarly, where there is no ambiguity, the default rule of the Second Restatement is not used. *See, e.g., Texas Farmers Ins. Co. v. Gerdes*, 880 S.W.2d 215, 219 (Tex. App.1994).

■ The anti-assignment clause at issue here prohibits the subcontractor from either assigning rights or delegating responsibilities. Assignment of "the contract" is not mentioned. There is no ambiguity, and the intent of the parties is clear. The anti-assignment provision is therefore enforceable.

**B. UCC Article 9 Does Not Invalidate the Anti–Assignment Clause**

■ Riley incorrectly argues that UCC § 9–318(4), as adopted by Michigan in Mich. Comp. Laws § 440.9318(4), invalidates the anti-assignment clause. The section reads:

> [a] term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.

Mich. Comp. Laws § 440.9318(4) (1994).[1] Michigan courts have not provided instruction on the scope of the section.

Article 9 governs secured transactions. As an initial matter, we note that it is not clear whether or not an assignment of accounts under a holdback arrangement of this sort creates a security interest, without an expression of intent to create such an interest. Every sale of property does not create a security interest. On the question of sales of accounts, however, the UCC is unclear. Mich. Comp. Laws § 440.1201(37) defines a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation." There is no reason to think that the assignment from Clover to Ameritech (or from Ameritech to Riley) secured payment or performance on the part of either party. The second as-

---

1. Michigan revised its version of Article 9 in 2000 to reflect a new version of UCC Article 9; these changes became effective July 1, 2001 while appeal in this case was pending. The 2000 amendatory act "does not affect an action, case, or proceeding commenced be- fore this amendatory act takes effect." Mich. Comp. Laws § 440.9702(3). The provisions discussed in this opinion are therefore from the 1994 version of the code, in effect when the suit was filed.

signment of the uncollected accounts receivable, in fact, *was* the payment and final performance under the contract.

However, the same section notes that "the term [security interest] also includes any interest of a buyer of accounts ... which is subject to article 9." *Ibid.* On a plain reading, this includes both Ameritech's and Riley's interests when they "bought" the accounts as part of the hold-back arrangement. The question then seems to be whether those transactions were "subject to article 9." [2]

Mich. Comp. Laws § 440.9104(f) states that Article 9 does not apply:

> To a sale of accounts or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts or chattel paper which is for the purpose of collection only....

The purpose of the § 9104 exclusions was to ensure that Article 9 did not become entangled with transactions that have nothing to do with commercial financing. The sale of accounts attached to the sale of a business differs widely from, for example, the sale of accounts to factoring companies that is the meat and drink of the accounts receivable market. *See, e.g., Brookridge Funding Corp. v. Northwestern Human Servs.*, 175 F.Supp.2d 355 (D.Conn.2001).

Riley asserts that the New York Supreme Court's decision in *Quantum Corporate Funding, LTD. v. Fidelity & Deposit Company of Maryland*, 258 A.D.2d 376, 685 N.Y.S.2d 688 (1999), interprets UCC § 9–318(4) to void anti-assignment provisions. Riley's reliance on *Quantum* is misplaced. The decision did void a non-assignment clause in a contract. However, it did so because the party seeking assignment requested and received an estoppel letter authorizing the payment to a third party from the other party to the contract. The *Quantum* court held that a non-assignment clause in a contract was not "an equitable basis to invalidate the estoppel certificate...." *Id.* at 690. *Quantum* is not similar to the current case.

Riley makes two more arguments that the assignment at issue is governed by Article 9. First, Riley claims that even though the first assignment (from Clover to Ameritech) may have been outside of the scope of Article 9, the second assignment (from Ameritech to Riley) was inside that scope because of Mich. Comp. Laws § 440.9318(1), which states that all of the terms of the original contract apply to any assignee of rights under that contract.

This is incorrect. This provision of the UCC is meant to prevent assignees from taking completely free from defenses that an obligor could assert against the assignor. In this case, even if the assignments at issue were not exempted from the UCC, Mich. Comp. Laws § 440.9318(1) would act to prevent Riley from taking free from defenses that HP could have asserted against Clover.

Second, Riley claims that Article 9 applies to the sale of accounts as part of the originating business because he believes the accounts at issue here are:

---

**2.** Federal courts generally hold that Article 9, including § 9–318(4), is applicable (if not always controlling) to whether non-assignment clauses void assignments of accounts receivable; *see Wonsey v. Life Ins. Co.*, 32 F.Supp.2d 939 (E.D.Mich.1998); *Kent Meters, Inc. v. Emcol of Illinois, Inc.*, 768 F.Supp. 242 (N.D.Ill.1991); *Brookridge Funding Corp. v. Northwestern Human Servs.*, 175 F.Supp.2d 355 (D.Conn.2001). However, we note that even if the assignment of accounts receivable as part of the sale of a company (see below) *were* a transaction covered by UCC Article 9, the fact would remain that the record here shows none of the formalities (*e.g.*, security agreement, filing, etc.) generally used to create a security interest.

security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract, and lease or consignment intended as security.

Mich. Comp. Laws § 440.9102(2). This section is controlled by the more specific language of Mich. Comp. Laws § 440.9104(f), which exempts from Article 9 sales of accounts as part of a sale of the business out of which they arose, or an assignment of accounts or chattel paper that is for the purpose of collection only.

It is clear that UCC § 9–318(4) (Mich. Comp. Laws § 440.9318(4)) does not prohibit application of the anti-assignment provision in the case at hand. *Wonsey v. Life Ins. Co.*, 32 F.Supp.2d 939, 942 (E.D.Mich.1998) ("As such, plaintiff is therefore precluded from invoking Article 9. Section 9–318(4) may not operate, in and of itself, to nullify the settlement agreement's prohibition on assignments."). We next examine current common law trends to determine whether the anti-assignment clause should be enforced.

C. "Modern–Trend" Analysis: The Rule of *Wonsey* Should Not Be Extended to the Current Case.

Riley relies heavily on *Wonsey v. Life Ins. Co.*, 32 F.Supp.2d 939 (E.D.Mich.1998) to argue that a "modern trend" of cases renders the anti-assignment clause unenforceable. In *Wonsey*, the plaintiff was injured when he was a six-year-old child. *Id.* at 939–40. The plaintiff's parents entered into a settlement on his behalf with the tortfeasor's insurance company. The settlement involved the establishment of an annuity benefitting the plaintiff. The annuity contract contained an anti-assignment clause, which stated that "Plaintiffs should have: (1) no right to change the

beneficiary of the policy … [and] (5) no right to assign the policy." *Id.* at 940.

The *Wonsey* plaintiff wished to sell his annuity contract. He therefore brought suit to "set aside a provision in a structured settlement agreement which prohibits assignments of future payments to be made under an annuity policy." *Ibid.* The plaintiff relied on Mich. Comp. Laws § 440.9318(4), Michigan's adoption of UCC § 9–318(4), which renders anti-assignment clauses inoperable as a general principle. However, the defendant life insurance company pointed out that Mich. Comp. Laws § 440.9104(g) (UCC 9–104(g)) excludes insurance polices from the ambit of Article 9.

The *Wonsey* court therefore correctly decided that under Michigan's adoption of the UCC, § 9–318 does not prohibit those anti-assignment clauses that are expressly exempted from Article 9. *Wonsey*, 32 F.Supp.2d at 942. However, the *Wonsey* court next delved into common law principles (which Riley terms the "modern trend"), and agglomerated several holdings from different sources. Most importantly, the court examined the District of Columbia Circuit's opinion in *Fox–Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346 (D.C.Cir.1971), in which the court commented: "Where a term in a contract prohibits assignment and is not rendered ineffective by statute or otherwise, the term is to be construed, unless a different intention is manifested, … to be for the benefit of the obligor, and not to prevent the assignee from acquiring rights against the assignor…." *Id.* at 1351 (citations omitted).

The *Wonsey* court then elided the holding of *Fox–Greenwald* and the provisions of the Restatement to find that a non-assignment provision cannot be enforced against the person for whose protection the provision was included. As a result, the court found that the non-assignment

provision was for the protection of the beneficiary of the annuity, and that no additional prejudice to defendant's interests was imposed by the voiding of the contract provision. *Wonsey,* 32 F.Supp.2d at 943.

There are two reasons not to follow the example of *Wonsey* in this case. First, *Fox–Greenwald,* upon which *Wonsey* relies, was an interpretive-rule decision, which held that agreements are to be interpreted to allow assignment of rights to payment "unless a different intention is manifested." *Fox–Greenwald,* 452 F.2d at 1351. Here, the parties have unambiguously manifested a different intent.

Second, the rule of *Wonsey* does not decide this case. In *Wonsey,* it was clear that the non-assignment provision was set in place to protect a minor from wasting his assets. *Wonsey,* 32 F.Supp.2d at 944 ("[the anti-assignment clause] appears more likely to have been seen as a protective measure to safeguard the interests of plaintiff, until such time as he reached adulthood"). Here, the non-assignment language was for the protection of HP. *Wonsey* should not be read to hold that a non-assignment clause entered into for the benefit of a party may not be enforced by that party. *Wonsey* holds the direct opposite. There is no reason whatsoever to void a valid contract clause entered into by equal partners. Since, in the language of *Wonsey,* Riley has failed to "overcome the presumption" that the non-assignability clause is for the benefit of HP, we should enforce the contract provision. *Ibid.*

### D. Clover Was Not "Discharged" From Its Obligations Under the Contract

Riley asserts that Clover was discharged from its obligations under the agreement once it performed the work. On this argument, Clover was free to ignore the prohibition on assignments once it performed its work and the payments be-

came due under the contract. The argument is based on an incorrect reading of the survival clause of the contract. This clause states that certain provisions (not including the non-assignment clause) "shall survive the termination of this agreement." Riley argues that once Clover performed its side of the bargain, the agreement was terminated, and all that remained was HP's duty to pay.

Termination of the agreement is different from one party's performance, or breach, of the contract. The termination provisions of the agreement note that the agreement will remain "in effect until termination with or without cause by either party on sixty (60) days written notice." Termination of the agreement is cessation of an ongoing business relationship contemplated and regulated by the agreement. The agreement cannot be terminated (especially in violation of its terms for termination) by breach or performance. Therefore, we reject the argument asserted by Riley based on the survival clause.

### III

The judgment of the district court is therefore AFFIRMED.